## Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc. (No. 3)

*Theodore Voorhees* and *Barnes, Dechert, Price, Myers and Rhoads,* for petitioner.

*Thomas M. Hyndman, Jr.,* and *Duane, Morris and Heckscher,* for respondents.

MILNER, J., August 29, 1958.—We are considering five different petitions of the Girard Trust Corn Exchange Bank which seek to establish the bank's right to preferential payments from the receivers appointed by this court for Warren Lepley Ford, Inc.* The bank's claims arise out of transactions between the bank and Lepley whereby the bank financed automobiles sold by Lepley. When the bank discovered that Lepley had violated the financing agreement and misappropriated funds received from the sale of financed cars, it petitioned the court for the appointment of receivers.

## I. *The $61,914.40 Petition*

In its first petition, the bank claims preference to the proceeds of certain cars which the receivers took possession of and, in due course, sold. Under the provisions of a wholesale credit plan (a copy of which is attached to the petition as exhibit "A"), the bank financed the purchase of new Ford automobiles which Lepley held for sale.

To perfect its security interest in the cars financed under the wholesale credit plan, Girard filed a financing statement as required by section 9-302 of the Commercial Code. This statement described the collateral subject to Girard's security interest as "motor vehicles . . . financed by Girard Trust Corn Exchange Bank under its Wholesale Credit Plan."

Lepley was required to immediately pay over to bank the proceeds obtained from retail sales of these financed cars, but during the months of November and December 1958, Lepley sold cars financed by the bank without turning the proceeds over to the bank. The new cars were sold for $93,137.98, which was de-

---

* The terms "bank" or "Girard" used in this opinion refer to Girard Trust Corn Exchange Bank; the term "Lepley" refers to Warren Lepley Ford, Inc.

posited by Lepley in its accounts with Girard and the Fidelity-Philadelphia Trust Company. This sum of $93,137.98 was received by Lepley either directly from the purchasers of motor vehicles financed by Girard under the wholesale credit plan or from the sale by Lepley of retail installment sales contracts received directly from purchasers of motor vehicles financed by Girard under the plan. In addition to these cash proceeds, Lepley also acquired used automobiles from its customers in trade for the new cars financed by the bank. These used cars were sold by Lepley for $22,534.50, which sum was also deposited in Girard and Fidelity-Philadelphia Trust Company. Thereafter, Lepley purchased new automobiles with certified checks drawn on the deposit accounts in the Girard and Fidelity, and these automobiles were sold by the receivers for the $61,914.40 in dispute on this petition.

About the beginning of November 1956, Girard refused to finance the purchase of additional motor vehicles by Lepley from Ford, because Lepley's indebtedness to Girard under the wholesale credit plan exceeded the credit limits fixed by Girard at $400,000. Thereafter, Lepley purchased 28 motor vehicles directly from Ford Motor Company by the use of certified checks on the bank account into which the deposits of $115,672.48 (total of $93,137.98 and $22,534.50) were made. Six cars were purchased with certified checks, totalling $12,302.16, drawn on the Girard account, and 22 cars were purchased with certified checks, totalling $49,612.24, drawn on the Fidelity account.

After Girard stopped financing the purchase of new cars by Lepley under the wholesale credit plan, it, nevertheless, continued to purchase the retail installment sales contracts received by Lepley on cars sold. In due course, Girard purchased 10 retail installment sales contracts on cars originally financed by Girard

under the wholesale credit plan, for a total sum of $19,807.38, which is included in the deposit figure of $93,137.98. Girard thus paid over to Lepley $19,-807.38, which Lepley actually owed to Girard under the wholesale credit plan, at a time when Girard had ceased to finance additional purchases of motor vehicles in order to require Lepley to reduce its indebtedness to Girard. At the time this was done, Girard had a complete record of the motor vehicles whose purchase it had financed and was aware that Lepley's indebtedness was not being reduced as rapidly as it should have been in the ordinary course of business. On December 8, 1958, Mr. Herbert W. Ritter, vice president of Girard, ordered a car check which disclosed that Lepley had sold many cars without paying Girard. Following this car check, Girard seized Lepley's bank account with it containing a balance of $54,645.89 and instituted proceedings for the appointment of receivers.

The question presented is whether the bank may trace the proceeds ($115,672.48), or any part thereof realized from the sale of financed automobiles into the bank as cash and then into new automobiles purchased with such cash proceeds and to assert a priority claim on these motor vehicles, or the proceeds thereof, in the hands of the receivers. The conversion of these new automobiles by the receivers, of course, does not affect the bank's rights, if any.

Since the purchases of the 28 vehicles in question were not financed by Girard under its wholesale credit plan, it is clear that Girard does not hold a perfected security interest in these motor vehicles or any other priority claim against them, unless it is able to establish a claim by tracing the cash proceeds received by Lepley from the sale of motor vehicles which were financed under the Wholesale Credit Plan. The parties are in agreement that section 306 of article 9 of the

Uniform Commercial Code governs the rights of the parties.

Section 9-306 of the Uniform Commercial Code of April 6, 1953, P. L. 3, provides as follows:

"(1) *When collateral is sold, exchanged, collected or otherwise disposed of by the debtor the security interest continues on any identifiable proceeds received by the debtor except as otherwise provided in subsection (2);* the security interest also continues in the original collateral unless the debtor's action was authorized by the secured party in the security agreement or otherwise or unless it is otherwise provided in Section 9-301, 9-303(2), 9-307, 9-308 and 9-309. The security interest in proceeds is a perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless

"(a) the financing statement covering the original collateral also includes the proceeds received on disposition of such collateral; or

"(b) it is perfected before the expiration of the ten day period.

"(2) In insolvency proceedings a secured party with a perfected security interest has a right to the cash and bank accounts of the debtor equal to the amount of cash proceeds received by the debtor within ten days before the institution of such proceedings less the amount of such proceeds received by the debtor and paid over to the secured party during the ten day period, but no other right to or lien on cash proceeds not subjected to his control before insolvency proceedings are instituted. Nothing in this subsection shall affect any right of set-off which might otherwise exist." (Italics supplied.)

The question presented is whether subsection (1) or subsection (2) governs in this matter. It is the

receivers' position that once collateral has been converted into cash, it cannot thereafter be reconverted into "identifiable proceeds" which may be traced. We are of the opinion that the better rule of construction requires that the tracing rule be preserved intact.

The underlined portion of subsection (1) is the only portion with which we need concern ourselves; there are no bona fide purchasers involved here, to which the second clause has reference; and the final provision referring to whether a security interest in proceeds is a perfected security interest is not here in issue because Girard's financing statement covering the original collateral also included proceeds received on disposition of such collateral.

There is nothing in subsection (1) or subsection (2) which requires the conclusion that "identifiable proceeds" cannot include and cover property acquired through cash arising from the conversion of the original collateral. Such a construction would most rigidly limit the words "identifiable proceeds", since, in most instances, it must be expected that a conversion will yield either cash or an account receivable. The words "identifiable proceeds" would then cover a credit sale but not a cash sale.

Subsection (2) deals only with cash proceeds in insolvency proceedings, that is, the debtor's cash or bank accounts turned over to the receivers. This subsection fixes the status of such cash and provides a simple rule to avoid controversy and as to cash there is no necessity for tracing and no advantage to tracing. Nothing in this subsection purports to govern the status of earlier cash transactions and conversions or to govern property purchased with cash proceeds of original collateral.

We are of the opinion that the legislature intended to continue the earlier law which permitted a secured creditor to trace his collateral security into any identi-

fiable proceeds, in the event of its disposition by the debtor and the only change that was made was as to cash which came into a receiver's possession. Where cash proceeds are reconverted into property or non-cash proceeds prior to insolvency and such noncash proceeds are identifiable, they are no longer cash proceeds and are identifiable proceeds subject to the general rule set forth in subsection (1). We do not consider it necessary to review at length the official comments found under section 9-30'6, and it is sufficient to observe that we consider such comments to be in support of our view.

The receivers contend that the adoption of the rule of construction we have set forth will make it "incumbent upon every creditor to endeavor to trace cash proceeds into some noncash item in every insolvency proceedings." However, we are considering the problems of a secured creditor, not all creditors, and the adequacy of the protection afforded to a secured creditor by the code.

We have also considered the receivers' contentions that the bank was negligent, did not act in good faith, etc. We do not accept such contentions. See Judge Waters' opinion in this matter dated April 29, 1957, reported in 13 D. & C. 2d 119, where similar contentions of carelessness and wrongdoing were made.

With regard to this petition, it has been assumed that the facts demonstrate that the bank has been able to trace through the proceeds of sale of the original automobiles into the automobiles turned over to the receivers. We are not convinced that this has been satisfactorily done and we shall therefore condition our order on this petition. The parties should determine what other monies were in the Girard and Fidelity bank accounts at the time the new automobiles were purchased. There should be determined the daily balance in each account and the parties may consider

whether tracing is limited in any way if funds from other sources were present in these bank accounts.

## II. *The $7,307.14 (Reduced to Claim for $6,552.10). Petition for Proceeds of Property Subject to a Perfected Security Interest*

The bank financed seven automobiles for Lepley pursuant to the wholesale credit plan. These automobiles were sold by Lepley and the receivers took possession of the proceeds of such sales, consisting of three retail installment sales contracts and three used automobiles, which were sold pursuant to court order for the sum of $4,947.10.

The receivers took possession of a Ford automobile which had been purchased on or about July 3, 1956, by Lepley from University Motors, Inc. for the sum of $2,351.88. This purchase was made as part of an exchange of cars between Lepley and University Motors, Inc. When University Motors sold the above car to Lepley, Lepley sold to University for $1,805.38 a car which had been financed by Girard under the wholesale credit plan. Girard claims that the car received from University was a noncash proceed received on the sale of Lepley's car. This car was sold by the receivers pursuant to court order for the sum of $1,-605, and it is agreed that Girard's maximum recovery on this petition is limited to $6,552.10, sum of $4,-947.10 and $1,605.

It is clear that this petition is governed by section 306(1) of the code wherein it is provided that where collateral is sold by the debtor, the security interest continues on the identifiable proceeds. The security interest remained a perfected security interest because Girard's financing statement covering the original collateral included the proceeds received on disposition of the collateral. The receivers concede that the bank's security interest was transferred to the installment

sale contracts and the used cars, but they seek to limit recovery to $4,947.10.

The facts as stipulated are to the effect that the exchange of checks and automobiles is the method commonly used by automobile dealers for the exchange of automobiles; that the exchange transaction is consummated by giving each other a check for the full value of the car received, rather than by having the dealer with the less expensive automobile pay the other dealer the difference between the values of the two cars. We are satisfied that the substance and reality of this transaction was one of exchange; that one automobile was actually being substituted for another and therefore the bank's security interest continued on the exchange automobiles and was not lost by a supposed conversion of the original automobile to cash proceeds. We shall make absolute the rule granted on this petition for the sum of $6,552.10.

### III. *The $27,467.13 (Corrected to $5,608.69) Petition for Certain Cash Proceeds*

In this petition, Girard seeks to recover the cash received by the receivers up to the amount which Lepley received within 10 days prior to the institution of insolvency proceedings, as provided by section 9-306-(2) of the Uniform Commercial Code.

It is agreed that within 10 days prior to the institution of the receivership, Lepley received $14,397.72 in cash from the sale of motor vehicles financed under the wholesale credit plan; that the net actual cash and checks of Lepley received by the receivers is $5,608.69, and the parties have agreed that bank's claim is, in any event, so limited, presumably because no other cash proceeds were available against which to make any claim.

The sole question presented arises from the fact that Girard, in the exercise of its right of setoff, seized

Lepley's bank account with Girard, which contained $54,845.89.

Section 9-306(2) of the code provides as follows:

"In insolvency proceedings a secured party with a perfected security interest has a right to the cash and bank accounts of the debtor equal to the amount of cash proceeds received by the debtor within ten days before the institution of such proceedings less the amount of such proceeds received by the debtor and paid over to the secured party during the ten day period, but no other right to or lien on cash proceeds not subjected to his control before insolvency proceedings are instituted. Nothing in this subsection shall affect any right of set-off which might otherwise exist."

It is not disputed that the bank in this case has the status of a secured party with a perfected security interest. The bank, therefore, clearly has the right to the cash proceeds in dispute unless the exercise of its right of set-off is a barrier to recovery. The answer is found in the clear language of the subsection that nothing therein contained "shall affect any right of set-off which might otherwise exist." The moneys deposited in Girard which were seized by the bank in the exercise of its right of setoff were not payments made to the bank, and we cannot accept the suggestion that the deposits made be treated as such payments.

Section 9-306(2) gives a secured party the right to a debtor's cash proceeds received in the 10-day period in lieu of the right to trace which a secured party had prior to enactment of the code. The language continues that the creditor shall have "no other right to or lien on cash proceeds not subjected to his control before insolvency proceedings are instituted." Here, the bank had control of Lepley's deposits and was in a position to exercise an independent right of setoff. We consider it to be clear that the phrase "not subjected to his control" recognizes that a creditor is privileged to

exercise whatever other rights he may have against funds subject to his control in addition to the rights specified in section 9-306(2). The right to proceeds obtained by the debtor within 10 days prior to insolvency is in lieu of prior tracing rights and is completely separated from the creditor's reserved rights of setoff. The suggestion that the exercise of the right of setoff is also a satisfaction of the bank's rights under section 9-306(2) is without merit.

The fact that the bank by exercising its setoff rights, recovered an amount substantially in excess of the amount provided for by section 9-306(2) is without significance. The bank had the full legal right to recoup as much of its losses as possible in this matter. We need not consider what rule would obtain if the bank seized the cash proceeds basing its action under section 9-306(2) in the exercise of its rights of setoff. It appears that, in any event, the amount of the present claim plus the proceeds seized by way of setoff does not exceed the cash proceeds received in the ten day period. We shall make the rule absolute on this petition in the sum of $5,608.69.

*IV. The Petition for Payment of $8,628.52 (Corrected to $7,458.64) Out of the Proceeds of Property Subject to a Security Interest Granted to Maryland Credit Finance Corporation and Assigned to Girard Trust Corn Exchange Bank*

On September 7, 1954, Warren W. Lepley and John F. Cantrell were operating a Ford dealer's agency as a partnership under the name Warren Lepley Ford. On this date the partners, individually and as partners, entered into an agreement with Maryland Credit Finance Corporation (a copy of which is attached to the petition) whereby Maryland agreed to lend "Lepley and Cantrell" the sum of $50,000 and a further sum of $50,000 upon described conditions. The phrase

"Lepley and Cantrell" is defined in the agreement as a reference to the partnership and the individual partners. Lepley and Cantrell agreed to execute a $50,000 judgment note and an additional note if the second loan were made, both notes also to be signed by Jerry R. Lepley, the wife of Warren W. Lepley.

Paragraph 8 of the agreement provided:

"As additional security for any loans made hereunder, Lepley and Cantrell agree that Maryland shall have and they hereby give to Maryland a security interest in all personal property which may be brought for business purposes upon the premises 5401-09 Oxford Avenue, Philadelphia, Pennsylvania, or upon any storage or parking lot used by Warren Lepley Ford, including all inventory, new and used automobiles, trucks and trailers, parts and appliances, paints and supplies, all equipment furnishings and fixtures, lifts, hoists, pumps, compressors, and other business equipment, whether or not such property is now possessed or hereafter acquired and whether or not such property is now or hereafter affixed to the above-described realty."

The first $50,000 loan was made on September 7, 1954, and the second on or about January 3, 1955, and the judgment notes contemplated by the agreement were given. On or about March 8, 1956, the partnership business was incorporated as Warren Lepley Ford, Inc., and the corporation took over the assets and assumed all liabilities of the partnership. On June 6, 1956, Maryland filed a financing statement executed by the corporation covering "all inventory of used automobiles, trucks, trailers, parts and appliances, paints and supplies, business equipment, furnishings and fixtures, now possessed or hereafter acquired." The partnership made payments on the loans until it was incorporated and the corporation made the payments thereafter. When the receivers

were appointed there was a balance due on each loan in the sum of $3,729.32, or a total of $7,458.64.

On December 12, 1956, immediately prior to the appointment of the receivers, Maryland assigned to Girard "its right, title and interest in and to the within agreement and the property covered thereby" and authorized Girard "to do every act and thing necessary to collect and discharge the same." Simultaneously, Maryland assigned to Girard all of its right, title and interest in the notes given under the agreement.

On January 18, 1957, Girard entered judgment on the notes against Warren W. Lepley, Jerry R. Lepley and John F. Cantrell, in the amount of $4,314.26 each. On February 5, 1957, the receivers sold the inventory of the corporation for $39,850, and it is agreed that at least $7,458.64 of this sum derived from inventory is covered by the financing statement.

On March 7, 1957, Girard, in consideration of the payment to it of $150,000, gave to Warren W. Lepley, Jerry R. Lepley, John F. Cantrell and Mary Ruth Cantrell a general release from all obligations to Girard. This release provided that the judgments entered were excepted from the release "solely for the purpose to enable the party of the first part to recover thereon against any partnership assets of Warren Lepley Ford and against Warren Lepley Ford, Inc., and the estate of Warren Lepley Ford, Inc. in receivership proceedings, the said obligations thereon having been assumed by Warren Lepley Ford, Inc. upon its incorporation." The release further provided that these judgments would not be asserted against any of the individuals; that "upon termination of the receivership (Girard) will execute and deliver to (the individuals) a full and complete release and discharge without reservation of this judgment . . ."

The receivers concede that Maryland, and the bank by assignment, acquired a perfected security interest

by properly filing the financing statement: Uniform Commercial Code of April 6, 1953, P. L. 3, sec. 9-201, et seq., 12A PS §9-201, et seq. The receivers, however, contend that the bank may not effect a second and separate recovery; that a creditor may only recover on a debt once. We consider it clear that Warren Lepley Ford, Inc., is a principal obligor and is not a surety insofar as the security interest is concerned; the rule that release of the principal from his obligation effects a discharge of the surety (First National Bank of Irwin v. Foster, 291 Pa. 72 (1927) ; Restatement of the Law of Security, §122; Summary of Pennsylvania Jurisprudence, Surety and Guarantor §8) does not apply.

Since it is admitted that the obligations of the partnership were assumed by the corporation, the corporation became independently and severally liable to Girard: Mitchell, Receiver of the Liberty Clay Products Co., 291 Pa. 282, 291 (1927) ; Mintz v. Tri-County Natural Gas Co., 259 Pa. 477 (1918) ; Cox v. Philadelphia Pottery Company, 214 Pa. 373 (1906) ; Sebastian Delp v. Bartholomay Brewing Co., 123 Pa. 42 (1888).

The key question presented is as to the effect of the $150,000 payment on the corporation's liability, i.e., was the corporate liability extinguished inasmuch as the payment exceeded the amount of the corporation's liability? The bank contends that a party who is severally liable is not discharged of his obligations by the release of another who is severaly liable, citing Schock v. Miller, 10 Pa. 401 (1849) ; Singer v. Ritter, 167 Pa. Superior Ct. 154 (1950) ; Restatement of the Law of Contracts, §123.

However, the law in Pennsylvania provides that a payment by one of several persons who are jointly, severally, or jointly and severally obligated on a debt, must be applied in reduction of the obligation of the

remaining obligors. In Goldbeck v. Kensington National Bank, 147 Pa. 267 (1892), one of three endorsers of a note was released by the obligor upon the payment of $14,000. The release specifically provided that " '. . . nothing herein contained shall be construed as releasing John H. Goldbeck or Charles F. Goldbeck, who are also parties to said notes.' " It was held that the other obligors on the note were entitled to a credit of $14,000 against their obligation. The Supreme Court, in a per curiam opinion, affirmed the following language of the lower court (at page 271) : "An actual payment, such as this was in substance, made by one of the debtors, must enure to the benefit of all of them, or otherwise the debt might be recovered as many times as there were debtors." See also Act of March 22, 1862, P. L. 167, 59 PS §§131-135.

The bank has clearly agreed not to enforce against individuals severally liable with the corporation the judgment notes which secured the debt and has agreed to deliver a general release after this receivership is terminated; and for this agreement it received a lump sum of $150,000, which comprehended various items of obligation. In the absence of any evidence attributing a specific smaller sum or no sum at all to payment on account of this debt, we must regard the debt as paid in full. This is the rule which we deem to be expressed in section 120 of the Restatement of the Law of Contracts which provides as follows:

"§120. WHEN PART PAYMENT RECEIVED FROM ONE PROMISOR OPERATES IN FAVOR OF CO-PROMISORS.

"(1) Full or partial performance of his contractual duty by one promisor severally, or jointly, or jointly and severally bound for that performance, terminates to the extent of the performance received the right of the person receiving the performance to enforce for his own benefit the promises of the other promisors.

"(2) Full or partial satisfaction by any method of the contractual duty of one joint, or joint and several promisor, satisfies to the same extent the duties of all the promisors.

"(3) In the absence of an agreement in specific terms to the contrary the amount or value of any consideration received

"(a) as satisfaction in full or in part of the duty of one or more promisors severally bound, or

"(b) for a promise of permanent forbearance to enforce in full or in part the duty of one or more promisors severally, or jointly, or jointly and severally bound,

terminates to the extent of that amount or value the right of the person receiving the consideration to enforce for his own benefit the promises of the other promisors."

Subsection 3 of the above-quoted section of the restatement governs the present situation.

For the reasons given above this petition will be dismissed.

V. *The Petition for Reimbursement for Payments of Certain Insurance Premiums ($11,512.09) as a Cost of Administration*

In the fifth petition it is set forth that the bank and Lepley entered into a financing agreement on November 19, 1956, which governed the purchase by the bank of installment sales contracts arising out of the retail sales of automobiles by Lepley. Paragraph 2 of this agreement provided as follows:

"2. Insurance: The Bank requires that the Dealer will cause the motor vehicles to be insured against such risks, in such amounts and in such companies as shall be satisfactory to the Bank, the policies with loss payable clauses in favor of the Bank to be delivered

to the Bank, and will save the Bank harmless from loss by reasons of failure to maintain such insurance until the account is paid in full. The Bank agrees that in the event of a collision resulting in a repossession, it will assume $50.00 of such loss."

The terms of the installment sales contracts between Lepley and its customers provided that the customers were obligated to pay for the insurance, and the premiums for such insurance were included in the amounts financed. The amount paid to Lepley by bank for the purchase of the installment sale contracts included the amount for the insurance premiums.

By December 13, 1956, when the court appointed the receivers, the bank had purchased certain installment sales contracts from Lepley, and thereafter the bank discovered that Lepley had failed to pay the insurance premiums and that the insurers had the right to cancel the various policies. In order to avoid cancellation of such policies and after notice to the receivers and after demand upon Lepley to pay the premiums, the bank paid $11,512.09 to various insurers or brokers. The named beneficiaries of the policies in question were Girard and the owner of the automobile. At the time the premiums were paid the bank had not suffered any actual loss.

The bank contends that any loss or damage not covered by insurance would have caused a liability of Lepley to bank; that the premium payments were therefore made for the protection of the assets and estate of Lepley and avoided the risk of contingent liabilities and was in the interest of all creditors.

The receivers contend that the premium payments were made for the protection of assets securing obligations held by the bank, that such payments were in the interest of the bank and not for the benefit of creditors.

The law is clear to the effect that the expenses of a receivership necessary for the preservation of the debtor's assets are a proper charge against the fund administered: Wood Admrs. v. Wood, 312 Pa. 374, 380 (1933); Bauer v. Wilkes-Barre Light Co., 274 Pa. 165, 169 (1922); Phillippi v. Beckman, Sec. of Bkg. 135 Pa. Superior Ct. 268, 272 (1939). Such expenses are not necessarily those incurred by the receivers, e.g., where a creditor takes action to preserve the assets of the debtor during the receivership the expense incidental to such action may be a proper charge against the funds of the receivership. However, it must clearly appear that any such expenditures were made by the creditor in the interest of the debtor's estate and not for the protection of the creditor's personal interests. Further, where the receivers are acquainted with the facts and have determined that certain expenditures shall not be made, a clear abuse of discretion must appear before the court will override such decision. See Fletcher Cyclopedia of the Law of Private Corporations, §7918, wherein it is set forth that the creditor who initiates the action for appointment of a receiver may be allowed an attorney's fee for the services rendered in bringing the action and securing the appointment of a receiver. Receivers are the ones charged with the duty and responsibility of taking possession of and protecting the assets of the debtor and they are the ones responsible for the determination as to what expenditures are necessary and desirable for the preservation of the assets in the interests of the creditors.

The basic test of whether an expense can be properly treated as an administration expense is the tangible benefit conferred on the estate. 3 Collier on Bankruptcy, 14th Ed., §62.05 page 1425. Insurance is frequently a proper administration expense,

but whether such expenditure is warranted or required depends upon the facts of each case. In 3 Collier on Bankruptcy, §62.14, page 1520, the principal is stated as follows:

"Before insuring property, the officer should be certain that he is thereby securing the interests of the estate and not those of a third person, for instance a claimant or the bankrupt personally (because of exemption) or a lienholder. Though the estate would enjoy the benefit of the proceeds of the insurance, if recovered, even though the property were not a part of the bankrupt's estate, since the real party in interest is not subrogated to the policy holder, yet the cost of such a speculative operation is certainly not what is meant by necessary costs of administration. Only an actual interest vested in the estate justifies the cost of insurance."

In this case the bank and the individual automobile owner were named insureds and any policy proceeds would have been paid to either of them. The receivers in their brief state the following in support of their refusal to expend monies for insurance:

"Under the terms of the contract Girard was entitled to recover from Lepley if Lepley failed to maintain the insurance as required and if as a result Girard suffered any loss, Girard as the owner of the installment sale contracts has two sources of payment (1) the general credit of the purchaser of the car and (2) the car itself (title to which is retained by Girard). Accordingly, Girard suffers a loss because of the lapse of insurance only if (1) there is an accident and (2) after the accident it is unable to secure payments from the purchaser or the remains of the car. Cars are not financed to their full value and in most instances it is unlikely that in the event of an accident Girard would suffer an actual loss. Liability of Lep-

ley to Girard for failure to maintain the insurance is therefore contingent upon the happening of all the foregoing events.

"Assume that loss is suffered and Girard is obligated to make claim as a general creditor, it will then receive on that claim the same dividend as is paid to all other general creditors, in all likelihood only a small fraction of the total claim. However, if Girard procures insurance and thereby eliminates the claim it may reduce slightly the dividend to general creditors but will insure that it receives a 100% payment of what would otherwise be an unsecured claim against an insolvent estate. It is obvious Girard is the principal beneficiary (along with the owner of the car) of any insurance in the event of an accident, not the general creditors."

We are of the opinion that the receivers acted properly and in the best interests of all creditors; that the bank did not have the right or power to impose insurance charges on the insolvent estate. We shall, therefore, dismiss this petition.

### Order

And now, August 29, 1958, upon consideration of the five petitions herein filed by Girard Trust Corn Exchange Bank, the answers filed thereto by the receivers and the stipulation of the parties, it is ordered and directed as follows:

I. The rule heretofore granted on the first petition for preference in the amount of $61,914.40, is continued for the purpose of having an accountant examine all necessary accounts and records in order to determine whether the proceeds of the original automobiles covered by the financing statement between the Girard Trust Corn Exchange Bank and Warren Lepley Ford, Inc., are traceable into the automobiles turned over to the receivers and to report thereon to

the court in accordance with Pennsylvania Rule of Civil Procedure No. 1515.

II. The rule heretofore granted on the second petition for preference in the amount of $7,307.14, reduced and corrected to a claim for $6,552.10, is made absolute for a preference in the sum of $6,552.10.

III. The rule heretofore granted on the third petition for a preference in the amount of $27,467.13, reduced and corrected to a claim for $5,608.69, is made absolute for a preference in the sum of $5,608.69.

IV. The rule heretofore granted on the fourth petition for preference in the amount of $8,628.52, reduced and corrected to $7,458.64, is discharged.

V. The rule heretofore granted on the fifth petition for reimbursement for payments of certain insurance premiums in the sum of $11,512.09 is discharged.