CITIZENS NATIONAL BANK OF WHITLEY COUNTY *v.* MID-STATES DEVELOPMENT COMPANY, INC., MCMILLEN FEEDER FINANCE COMPANY, INC., AND CENTRAL SOYA COMPANY, INC.

[No. 3-576A122. Filed September 25, 1978. Rehearing denied November 17, 1978.]

*William M. Bloom, John S. Bloom, Bloom, Bloom & Fleck,* of Columbia City, for appellant.

*Thomas M. Shoaff, N. Reed Silliman, Shoaff, Keegan, Baird & Simon,* of Fort Wayne, for appellees.

GARRARD, P.J. — This appeal requires us to resolve the conflict that arises when a bank exercises a right of set-off against funds in a depositor's account that represent proceeds of accounts receivable and inventory in which a secured party has a perfected interest under the Uniform Commercial Code. The trial court, sitting without a jury, determined

that the secured party was entitled to these funds so that the bank's set-off amounted to a wrongful conversion of the property. We affirm the trial court's decision and hold that, on these facts, the Uniform Commercial Code requires that the bank, as an unsecured creditor, be subordinated to the perfected security interest in proceeds.

The facts, viewed most favorably to the judgment, disclose the following. Huntington Hatcheries, Inc. (Huntington) began operations in 1955 and at the time it filed a voluntary petition in bankruptcy in January of 1973 was a completely integrated egg processing business. The company manufactured feed, hatched chicks and grew pullets; all in connection with the production of table eggs. In addition Huntington sold feed, grain and "started pullets" to farmers. Nonetheless, the sale of table eggs remained a crucial phase of the company's business. In 1972 Huntington began experiencing financial difficulties due to the condition of the egg market. The price of eggs had been below the cost of production for some time and this, in connection with costs related to a recent expansion of facilities, spelled the need for additional capital if Huntington was to remain a going concern.

As a result, meetings were arranged with Huntington's two principal creditors, Citizens National Bank of Whitley County (the Bank) and Central Soya Company, Inc.[1] (Soya), in order to map out a strategy for the continuation of the business. In November of 1972 the parties and their attorneys met and discussed the necessity of providing additional capital to the company. In addition the respective security interests held by Soya and the Bank were made clear.[2] However, no consensus was reached and it was decided that the parties should meet again to resolve the problem. On December 26 or 27, 1972 such a meeting was held. At that time Soya proposed that it would furnish additional capital if it could

---

1.  Mid-States Development Company, Inc. and McMillen Feeder Finance Company, Inc., two wholly-owned subsidiaries of Soya, are also parties to this appeal. Since no interest distinct from that of Soya's is asserted by them we treat Soya and its subsidiaries as one entity throughout this opinion.

2.  Soya had a perfected security interest in Huntington's machinery and equipment as well as its accounts receivable and inventory including proceeds. The Bank held a mortgage on the company's real property and claimed that due to an earlier filing it had a prior interest in Huntington's machinery and equipment. The bankruptcy proceeding determined, however, that the Bank's claim of priority was without merit.

play an active role in the management of the company. The Bank agreed to this arrangement but wanted assurances that it would be kept adequately informed of Huntington's financial condition. Although the parties generally agreed to cooperate in this attempt to keep Huntington afloat, nothing specific was said as to how Soya would go about exercising managerial control of the company.

On December 28, 1972 Huntington executed documents recognizing that it was in default on the loans previously made by Soya and authorizing Soya to take possession of its collateral. This apparently was thought necessary or desirable in permitting Soya to exercise the control contemplated by the parties' agreement reached just days earlier. At the same time the Bank, through its board of directors, determined to exercise its right of set-off against the funds in Huntington's checking account. The set-off was made effective December 27, 1972[3] and amounted to $118,148.63. This action, taken without notice to Soya or Huntington, amounted to an express repudiation of the earlier agreement that was deemed necessary to Huntington's continued operation.

As a result of the set-off, the Bank refused payment of all checks presented on or after December 27, 1972, because of insufficient funds. These checks totalled $84,280.22 and had been drawn by Huntington in the ordinary course of its business. The day-to-day operation of the business then ceased and Huntington filed a Chapter XI bankruptcy petition.

At the time bankruptcy proceedings were instituted Huntington was indebted to Soya for approximately $860,000. As a result of the bankruptcy arrangement Soya assigned any claim that it might have under its security agreement to the company that acquired Huntington's stock. However, in releasing their interest in any collaterial under the security agreement with Huntington, Soya retained the right to recover the amount of the set-off from the Bank.

It was established that by virtue of its security agreement with Hunt-

---

3. The Bank had the right to refuse payment of checks for 48 hours after presentment. Though the decision was made on December 28, 1972, the Bank could thus set off an amount undiminished by checks drawn by Huntington and presented to the Bank one day earlier.

ington of July 1968, Soya obtained a security interest in inventory and accounts receivable, including after-acquired property, and proceeds thereof. The financing statements reflecting this security were filed with the Secretary of State and in Huntington County. It is undisputed that Soya's security interest in accounts receivable, inventory and proceeds was perfected and that the Bank had no security interest in the funds representing the collateral in the bank account. It was stipulated that the deposits in Huntington's account totalled $463,494.81. There is no dispute that the entire balance of the bank account at the time of the set-off represented proceeds of sales of inventory or the receipt of accounts.[4]

The Bank had made loans to Huntington which totalled, as of September 16, 1972, $198,066.78. A promissory note in this amount was due the Bank on December 10, 1972. The amount of the note represented the addition of $40,000, due to the extension of credit by the Bank in that amount on June 13, 1972, in addition to existing indebtedness of $158,066.78. The June 16, 1972 loan was the last advance made to Huntington and at that time no additional security in the company was taken by the Bank.

## I.

The Bank contends that the trial court erred in refusing to apply the tracing rules of IC 26-1-9-306(4)(d) to the present case. That section states:

"(4)   In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest

* * *

(d)   in all cash and bank accounts of the debtor, if other cash proceeds have been commingled or deposited in a bank account, but the perfected security interest under this paragraph (d) is

(i)   subject to any right of set-off; and

---

4.   As a factual matter the Bank does not challenge the trial court's finding that the funds subjected to set-off were made up entirely of sales of inventory and collection of accounts receivable. Rather the Bank contends that under the proper legal theory, merely showing that the funds were produced by sales of inventory and the collection of accounts is not sufficient to permit Soya to claim them as proceeds in which it has an equitable as opposed to a UCC security interest.

(ii)   limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten [10] days before the institution of the insolvency proceedings and commingled or deposited in a bank account prior to the insolvency proceedings less the amount of cash proceeds received by the debtor and paid over to the secured party during the ten [10] day period. . . ."

Since it is undisputed that the proceeds were deposited in a commingled account it is argued that Soya's security interest is, under this section, made subordinate to the Bank's right of set-off. In any event it is said Soya's recovery must be limited in accord with the provisions of the so-called "ten day rule."

This argument is without merit. It is premised on a misconstruction of the language and purpose of section 9-306(4)(d). The triggering phrase of that section is "In the event of insolvency proceedings instituted by or against a debtor. . . ." It is plain that the limiting provisions of subsections (4)(d)(i) and (ii) are to serve as tracing rules for the secured party asserting an interest in proceeds *only* when they are brought within the debtor's estate in an insolvency proceeding. *See* IC 26-1-9-306, Indiana Comment 4; Uniform Commercial Code § 9-306, Comment 2(a). Here the funds in question were not made a part of Huntington's estate in bankruptcy. For purposes of determining the validity and extent of Soya's proceeds security interest, the subsequent institution of bankruptcy proceedings in the present case is irrelevant. Since the limitations contained in section 9-306(4)(d) have no operation outside the area of insolvency proceedings the trial court properly disregarded them. *See Girard Trust Bank v. Lepley Ford, Inc.* (Phila. Co. C.P. 1968), 25 Pa. D. & C. 2d 395; II G. Gilmore, *Security Interests in Personal Property* § 45.9 (1965).

## II.

It is not disputed that Soya held a perfected security interest in the proceeds of Huntington's accounts receivable and inventory. Nor it is argued that the proceeds were not identifiable because deposited in a commingled account.[5] It is accepted that, aside from Soya's claim of a

5.   It has been argued that the funds in a commingled account are never "identifiable" within the meaning of UCC § 9-306(2) so that Soya would have no perfected security in-

proceeds security interest, the Bank had a right to set-off against funds deposited in Huntington's account. As a result we are faced squarely with a priority dispute between a setting-off bank and a secured party with an interest in the same funds as proceeds of collateral.

The Bank argues that rights of set-off are excluded from the Code's treatment of secured transactions. It therefore contends that we are enjoined to resolve this dispute without reference to the UCC and Code's adoption. Thus even though the Code permits a security interest to attach to after-acquired property, IC 26-1-9-204, the Bank contends that pre-Code law required Soya to show that the proceeds deposited in Huntington's account were the direct product of collateral or advances it furnished the debtor.[6] Similarly the Bank argues that where a secured party permits proceeds to be deposited in a general account it loses any *equitable*[7] right to such funds as against a right to set-off even though a debtor may use proceeds without accounting to the secured party under the Code. IC 26-1-9-205. Under this reasoning the Bank challenges the sufficiency of the evidence and the trial court's findings of fact, neither of which are deemed adequate to permit the court to conclude that the funds on deposit were proceeds to which Soya had a valid equitable claim. The Bank urges that, in any event, authorization to deposit such funds in a general account, as a matter of law, means that the Bank has greater equity in the funds.

Soya agrees that pre-Code law is relevant to the resolution of the

terest in such funds. *See* I.G. Gilmore, *Security Interests in Personal Property* § 27.4 (1965). However, the majority of courts facing the question have rejected this view. *Brown & Williamson Tobacco Corp. v. First Nat'l Bank of Blue Island* (7th Cir. 1974), 504 F. 2d 998 (collecting cases). The court in *Brown & Williamson* reasoned that so long as proceeds are traceable they are identifiable despite commingling. To hold otherwise would be to require the establishment of separate accounts and other "policing" devices which, broadly speaking, Article 9 was intended to do away with. Thus, since Soya's interest in proceeds can be traced to the account held by the Bank the proceeds are "identifiable" for purposes of IC 26-1-9-306(2). *See* 48 Temp. L.Q. 439 (1975), discussing *Brown & Williamson, supra.*

6. The Bank challenges the adequacy of the trial court's findings, the sufficiency of the evidence to support the verdict and the amount of damages awarded all on the theory that pre-Code law was applicable to this controversy. Since these specifications are urged solely in this context we treat as waived any other contentions that might be advanced under the specifications. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7).

7. *I.e.,* right not determined by the UCC.

priority dispute between it and the Bank but contends that the Code is controlling in defining the nature and extent of its own interest in the deposited funds as "proceeds." Thus it argues that under the Code Soya was entitled to the full amount on deposit as proceeds and that the Bank could prevail only if it could show reliance on the funds or superior equities. However, neither party raises what is, in our view, the dispositive argument: that the Code's priority rules, without resort to prior law, require Soya to prevail over the interest of a setting-off bank.

In determining whether the Code's chapter on secured transactions is applicable to the assertion of a bank's right of set-off we are confronted with statutory language that "This article [chapter] does not apply . . . to any right of set-off . . . ." IC 26-1-9-104(i). While the language is plain enough, the conclusion that this section removes from operation of the Code any controversy between a setting-off bank and a secured party is not warranted by the narrow purpose this provision was intended to serve. Professor Gilmore, a principal reporter for Article 9 of the Code, gives this explanation for the set-off exclusion:

> "This exclusion is an apt example of the absurdities which result when draftsmen attempt to appease critics by putting into a statute something that is not in any sense wicked but is hopelessly irrelevant. Of course a right of set-off is not a security interest and has never been confused with one: the statute might as appropriately exclude fan dancing. A bank's right of set-off against a depositor's account is often loosely referred to as a 'banker's lien,' but the 'lien' usage has never led anyone to think that the bank held a security interest in the bank account. Banking groups were, however, concerned lest someone, someday, might think that a bank's right of set-off, because it was called a lien, was a security interest. Hence the exclusion, which does no harm except to the dignity and self-respect of the draftsmen." *Gilmore, supra* at 315, 316.

Plainly banks need not comply with the requirements of Chapter 9 in order to assert set-offs against their depositors. But given the narrow purpose of the set-off exclusion we are unwilling to read it as removing commercial transactions or conflicts from the operation of the UCC whenever a bank's set-off is involved.

Acceptance of the narrow view of the set-off exclusion does not, however, resolve the priority dispute between the Bank and Soya. It is a predicate of the consideration of statutory and case authority relevant to the secured party versus setting-off bank conflict. We believe that the Code's priority rules require the proceeds security interest to prevail over a bank's right of set-off against funds placed in a general deposit.

The Code grants a secured party a "continuously perfected security interest" in proceeds under IC 26-1-9-306(2) and (3):

"(2)    Except where this article [chapter] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

(3)    The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten [10] days after receipt of the proceeds by the debtor unless

(a)    a filed financing statement covering the original collateral also covers proceeds; or

(b)    the security interest in the proceeds is perfected before the expiration of the ten [10] day period."

Clearly, the existence of this security interest in proceeds contemplates that the secured party's priority rights may be asserted against funds in a bank account so long as they are identifiable proceeds. IC 26-1-9-306, Indiana Comment 2; *Brown v. Williamson Tobacco Corp. v. First Nat'l. Bank, supra.* However, there is no specific priority rule that deals directly with the conflict between the proceeds security interest and a bank's set-off rights.

Nonetheless, underlying the complex of Code priority provisions is the keystone rule of IC 26-1-9-201 which states:

"General validity of security agreement. Except as otherwise provided by this act [26-1-1-101 — 26-1-10-106] a security agreement is effective according to its terms between the parties, against pur-

chasers of the collateral and against creditors. Nothing in this article [chapter] validates any charge or practice illegal under any statute or regulation thereunder governing usury, small loans, retail instalment sales, or the like, or extends the application of any such statute or regulation to any transaction not otherwise subject thereto."

The effect of this section is to give the Chapter 9 secured party, upon a debtor's default, priority over "anyone, anywhere, anyhow" except as otherwise provided by the remaining Code priority rules. *The Priority Rules of Article Nine*, 62 Cornell L. Rev. 834, 842 (1977); *see United States Shoe Corp. v. Cudmore-Neiber Shoe Co.* (D.C.S.D. 1976), 419 F. Supp. 135; *Corpus Christi Bank v. Smith* (Tex. 1975), 525 S.W.2d 501; J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* (1972) at 901. The Bank as a creditor of Huntington falls within the ambit of this section. There being nothing else in the Code to resolve the priority conflict between Soya and the Bank, section 9-201 is controlling. As an unsecured general creditor[8] the Bank's claim of set-off should be subordinated to the proceeds security interest asserted by Soya. *See* IC 26-1-9-301(1)(a); UCC § 9-301(1)(a) Comment 2; Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code*, 1 So. Ill. L.J. 120, 203 (1977); 7 St. Mary's L.J. 885, 901 (1976).

This resolution of the conflict between a setting-off bank and a secured party with a proceeds security interest is supported by *Associates Dis-*

---

8. In characterizing the Bank as a general unsecured creditor of Soya we do not diminish longstanding Indiana law which recognizes the special character of a bank's right of set-off. Money deposited in a general account becomes the property of the bank; the depositor becomes the Bank's creditor to the extent of the deposit. *Bedford Bank v. Acoam* (1890), 125 Ind. 584, 585, 25 N.E. 613. When the depositor becomes indebted to the bank, a mutual debtor-creditor relationship arises that justifies a bank's right of set-off, *i.e.*, a self-help device for extinguishing mutual debts. The right arises by operation of law, *Second Nat'l Bank v. Hill* (1881), 76 Ind. 223, 228, 229 and is founded both on fairness and on the nature of the bank deposit which permits the depositor to erase any mutual indebtedness by his withdrawal, *see* Olsen, *The Appropriation of Deposits for Debts: Levies, Liens and Setoffs*, 90 Bank. L.J. 827, 848 (1973). However, where this right is exercised unilaterally, no Code provision extends special protection to the bank vis-a-vis the proceeds security interest. Of course, if the depositor made a voluntary transfer to the bank in the ordinary course of his business, the bank could seek the protection of IC 26-1-9-206. *See Brown & Williamson Tobacco Corp. v. First Nat'l Bank, supra* at 1003; *Universal C.I.T. Credit Corp. v. First Nat'l Bank, supra* at 324.

*count Corp. v. Fidelity Union Trust Co.* (1970), 111 N.J. Super. 353, 268 A.2d 330. There a secured party with a perfected security interest in proceeds sought to recover funds in a general account which had been set-off by the depositary bank. The bank had no perfected security interest in these funds and was considered by the court to be simply a general creditor of the debtor. As in the present case, the bank relied on the set-off exclusion as a basis for asserting its prior right to the bank account. The court, citing Gilmore's explanation of the purpose behind § 9-104(i) stated:

"[2] Defendant relies on N.J.S.A. 12A:-9-104(i), which provides that

[T]his Chapter does not apply . . .

\* \* \*

(i) to any right of set-off . . . .

This section, however, cannot mean that a general creditor, as the bank is here with respect to the funds in question, may abrogate a perfected security interest simply by having a right to and opportunity for a set-off. All this section means is that a right of set-off may exist in a creditor who does not have a security interest." 268 A.2d at 332.

Thus the Bank's argument that under pre-Code law set-off was permissible so long as it did not have actual knowledge of the secured party's interest in the account is superfluous. The adoption of the Code which continued a secured party's interest in identifiable proceeds requires that this interest in proceeds prevail over the bank. 268 A.2d at 332. In short, prior law was superseded by the Code. *See also Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville* (E.D. Mo. 1973), 358 F. Supp. 317, 325.[9]

---

9. *Cf. City of Vermillion v. Stan Houston Equip. Co.* (D.C.S.D. 1972), 341 F. Supp. 707 where the court held that a city's claim of set-off against funds it owed to a public contractor is subordinate to a federal tax lien. If this right of set-off could be defeated by the hypothetical lien creditor of 26 U.S.C. § 6323(h) *a fortiori* it would fall before a perfected security interest. There is support for the view that the Code does not resolve the bank set-off versus security interest in proceeds conflict. Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code*, 1 So. Ill. L.J. 120, 204. However, the cases are either premised on a broad view of the set-off exclusion, which we have rejected, *First Nat'l Bank v. Lone Star Life Ins.* (Tex. 1975), 529 S.W.2d 68 (denying application for writ of error from Tex. Civ. App. 1975, 524

Finally, we believe the secured party should be able to rely on his compliance with the Code's requirements for perfection and his search of the public recording system as against the unrecorded interest of the setting-off bank. Were this otherwise a secured party with an interest in proceeds could not rely on recording but would be required to take additional steps to insure that he was accorded full protection. For example, the secured party might have proceeds deposited in a special account thus precluding a bank's set-off rights. *City Nat'l. Bank v. Brink* (1933), 98 Ind. App. 275, 187 N.E. 689; *see Michie on Banks and Banking* CA. 9 § 129 (1973). Under such a rule the secured party would have to require special accounts or inquire into loan transactions which are not a matter of public record. Putting such a duty on a secured party, as well as permitting a bank to prevail if that duty is not met, undercuts significant values of certainty, efficiency and reliance which are at the heart of the Code's emphasis on public filing. *See The Priority Rules of Article 9,* 62 Cornell L. Rev. 834, 838, 839. On the other hand a secured party might require that proceeds be payable to it before future advances would be made to the debtor. While this may be safe practice for a creditor, it is purposefully not required by the Code for the maintenance of a proceeds security interest since it tends to curtail commercial practice and business operation. IC 26-1-9-205; IC 26-1-9-306(2) and (3). In short, if Chapter 9 is to be a comprehensive system for the perfection of security interests in personal property we see no reason for requiring special standards, with their increased costs, that must be met if a secured party is to prevail over a bank's right of set-off. The Code's priority rules are sufficient.

## III.

The Bank's final contention is that the trial court awarded excessive damages in permitting Soya to recover the full amount of the funds made subject to the set-off. After the set-off was made effective the Bank dishonored for insufficient funds the payment of checks totalling $84,280.22 drawn by Huntington. These checks were made payable to various parties in the ordinary course of Huntington's business. It is

S.W.2d 525) or assume that the Code is inapplicable without so deciding, *Commercial Discount Corp. v. Milwaukee Western Bank* (1974), 61 Wis.2d 671, 214 N.W.2d 33.

argued that since such transferees or recipients of funds would have taken free of Soya's proceeds security interest had no set-off been effected, Soya's recovery against the Bank must be reduced by the amount of these dishonored checks.

While we concede that transferees in the ordinary course of business take free of a security interest in proceeds, Uniform Commercial Code § 9-306, Comment 2(c), we cannot agree that this entitles the Bank to a diminution of Soya's recovery. In our view the security interest in proceeds continues until the funds are actually transferred in the ordinary course of business. Here no such transfers were made because of the Bank's conversion of the funds deposited in Huntington's account. Thus, diminishing Soya's recovery would in no way protect transferees in the ordinary course of business. Instead it would provide a windfall by placing the Bank in a better position than it would have been if it had not converted the bank account to its own use.

Since no actual transfer to third parties in the ordinary course of business occurred, the trial court properly granted judgment for the full amount of funds deposited in Huntington's account at the time of the set-off. *Cf. Yeager and Sullivan, Inc. v. Farmers Bank* (1974), 162 Ind.App. 15, 317 N.E.2d 792, 799, 800.

The judgment is affirmed.

Hoffman, J. and Chipman, J. concur.

NOTE—Reported at 380 N.E.2d 1243.