JOHN S. TOUGH, *Appellee*, v. THE CITIZENS STATE BANK
OF ELLIS, *Appellant*.

No. 18,152.

SYLLABUS BY THE COURT.

BANK—*Crediting Money of Principal Deposited in Agent's Name
on Agent's Note. without Notice.* Under the facts stated in
the opinion it is held that a bank which, with permission from
the depositor, credited a deposit upon his note, was not
charged with notice that the money was derived from the sale
of a third person's property made by the depositor as agent.

Appeal from Ellis district court. Opinion filed May
10, 1913. Reversed.

*Ira E. Lloyd*, and *Norris F. Nourse*, both of Ellsworth, for the appellant.

*Harry Lewis Pestana*, of Hays, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff, John S. Tough, sued the
Citizens State Bank of Ellis for a sum of money. The
claim was that J. O. Walton sold, as agent, a team of
horses owned by the plaintiff to T. Cromb. Cromb
deposited the purchase money in the bank for Walton
and the bank applied the money upon a note given by
Walton, which it held. The defense was that the bank
had no notice of the plaintiff's claim to the money and
that Walton directed that it be credited upon his note.
The plaintiff recovered and the defendant appeals.

The plaintiff resides at Lawrence and is a dealer in
horses. He placed Walton in charge of his business
at Ellis, giving Walton unrestricted authority to buy
and sell in his own name according to his own methods
and discretion, Walton's compensation being a share
of the profits after all expenses were paid. He advertised the business in his own name, received the proceeds of sales, took purchase-money notes in his own

name, and paid the expenses of the business. While thus associated with the plaintiff, Walton also bought and sold horses on his own account. The plaintiff himself testified to this fact. In August, 1909, the plaintiff arranged with the cashier of the bank, G. W. Cross, to act as clerk at some sales of horses soon to be made by Walton. Pursuant to this arrangement Cross acted as clerk at two sales, one made on August 28, and the other on September 25, 1909. Notes given by purchasers of horses at these sales were discounted by the bank and the proceeds were paid to the plaintiff upon drafts drawn at intervals by him. A final account of these transactions was rendered to the plaintiff on December 7, 1909. In the course of them the bank, through its cashier, became apprised of the nature of Walton's relations to the plaintiff. On April 21, 1910, Cromb came to the bank and placed $330 to the credit of Walton, saying there was the money to pay for a team he bought of Walton. The money was credited upon Walton's note to the bank for $923.80 due April 30, 1910. On the evening of April 21, or the morning of the next day, Cross saw Walton and told him the money had been left at the bank by Cromb, and asked permission to credit it on the note. Walton said, "All right," and there is no evidence that he then gave any intimation that the money belonged to Tough. About May 4 a renewal note for the remainder of Walton's indebtedness was prepared and was taken away by Walton for the purpose of procuring his wife's signature to it. Walton testified that when he took the new note away he told Cross he had about $1500 profits from horses to be figured up with Tough, that when they settled he would straighten up this $330, that he would square this $330 with Tough when they settled, that he expected to settle with Tough in about sixty days, and that he would then pay the rest of the note. Cross testified that at no time before the old note was surrendered did he have any notice from Tough, from

Walton, or from any other source, that the money received from Cromb was claimed by Tough. Sometime after the new note was given and the old note was surrendered Tough informed Cross that "Walton did not own a hair in those horses' tails." Cross turned away and made no reply. Walton had no account at the bank subject to check when the deposit was made by Cromb. While Cross had no information that Walton's employment had terminated, there was no evidence of any new fact bearing upon the question of agency occurring after the 1909 sales and before the time when the renewal note was taken out.

The court gave the jury the following instruction:

"The burden is on the plaintiff to show that the $330 in controversy was his money, and also to show that at the time of its deposit by Cromb, the defendant knew that it was Tough's money, or knew that it was not Walton's money, or at least that the defendant had such notice of facts and circumstances as put it upon inquiry to find out to whom the money belonged, before assuming that it was Walton's money, or before applying it on Walton's indebtedness."

The jury returned the following special findings of fact:

"2. Were the horses which T. Cromb purchased shipped to and in the name of J. O. Walton, to Ellis, Kansas? A. Yes.

"3. Did J. O. Walton, while living in Ellis, Kansas, receive and sell horses in his own name as a dealer? A. Yes.

"4. Was there anything different in the transaction of J. O. Walton in selling the horses to T. Cromb from that of other sales by him of other horses which he owned and sold? A. No.

"5. At the time T. Cromb bought the horses from J. O. Walton was there anything said to the purchaser in the transaction which showed that John S. Tough, the plaintiff, was the owner of the horses, and, if so state what? A. No.

"8. At the time said $330.00 was paid into the Citizens State Bank did the bank, or any of its officers receive any notice, by facts and circumstances or any

information that the money was claimed as the property of John S. Tough? A. No.

"11. Was said $330.00 applied on said note of $923.80, and the note surrendered to J. O. Walton? A. Yes.

"13. Was J. O. Walton informed that T. Cromb had paid the bank the $330.00 for Walton's credit? A. Yes.

"14. Did J. O. Walton, after the credit of $330.00 was made on the said note of $923.80, knowingly receive the benefit of such credit by giving a renewal note for the sum of $609.30 to the bank, and receiving from the bank said note of $923.80? A. Yes.

"15. At the time J. O. Walton gave the renewal note of $609.30 to the bank, or before that time, did he make any claim to the bank, or any of its officers, that the $330.00 was owned by plaintiff, John S. Tough? A. Yes.

"16. After said $330.00 was credited on said note of $923.80, did J. O. Walton inform the bank, or any of its officers, that it was all right or words to that effect? A. Yes.

"17. After the Citizens State Bank had credited the $330.00 on the said note of $923.80, did J. O. Walton inform the bank, or any of its officers, that he would pay the rest of the note when he made a settlement with plaintiff? A. Yes.

"22. Did plaintiff about September 14th, 1909, buy and pay for the two horses sold by Walton to Cromb? A. Yes.

"23. Who was the owner of the two horses sold by Walton to Cromb? A. John S. Tough.

"24. At the time of the sale of the two horses mentioned in the last question was Walton the agent and employee of John S. Tough? A. Yes."

The general verdict was in favor of the plaintiff. Motions by the defendant to set aside the fifteenth special finding of fact, for judgment on the special findings, and for a new trial were overruled, and judgment was rendered on the general verdict.

The fifteenth special finding depends for support upon the testimony of Walton, the substance of which has been stated. Whether or not this testimony war-

rants the inference that Walton "claimed to the bank" that Tough owned the money in controversy is not material. The money had been credited upon Walton's note by his authority before the conversation occurred to which the finding relates. Consequently title had already passed to the bank unless facts previously known to it imposed the duty to make an inquiry respecting the ownership of the money. Nothing occurred to put the bank on guard when the appropriation was made. Finding No. 8 is explicit that when the money was received by the bank it had no notice by facts, circumstances, or information that the money was claimed as the property of Tough. Therefore the question is whether or not knowledge of Walton's previous agency for Tough was sufficient to make the bank responsible to Tough for the fund.

The deposit by Cromb having been assented to by Walton, the relation between the bank and Walton became that of debtor and creditor the same as if the deposit had been made by Walton himself. The case is not one in which the bank without permission applied the deposit to its own advantage. Walton appropriated the money to the payment of his debt by verbal act, which served the same purpose as his check. While Walton was dealing in horses on his own account Tough chose to have his business done in Walton's name instead of his own. Consequently it is scarcely fair to permit him to cast upon the bank the continuing burden of sifting out and running down at its peril the origin of funds found in Walton's hands. In the case of *Kimmel v. Bean,* 68 Kan. 598, 75 Pac. 1118, a bank applied a deposit of money to the payment of the depositor's overdraft. The depositor was a commission company engaged in selling live stock for others on commission, and the deposit consisted of the proceeds of a carload of hogs consigned to the company and sold in the usual course of its business. It was held that the fact that the bank knew the

company was engaged in the commission business did not charge it with notice of the derivation of the particular deposit from the consignor's property. So here, knowledge of the fact that Walton had formerly done business as Tough's agent was not enough to require the bank to investigate the source from which this money was obtained before accepting it on his debt. The same scrutiny of the title to money as of the title to other property can not be required or commerce would come to a standstill. Although the bank knew that the money in question represented the proceeds of a sale of horses it was essential, under the circumstances which have been narrated, that it should possess information naturally indicating a claim of the plaintiff upon the particular fund before any legal duty arose to institute an inquiry respecting Walton's power of disposition over it.

The defendant cites the cases of *Guernsey v. Davis*, 67 Kan. 378, 73 Pac. 101, and *Washbon v. Bank*, 87 Kan. 698, 125 Pac. 17. In the Guernsey case the party held liable for the money actively participated in the conduct of the agency transaction itself with full knowledge of the agent's duty. In the Washbon case the bank, knowing of Sarbach's defalcation, issued to him a certificate of deposit to enable him to conceal the fact from the grand lodge, and when the certificate so issued was returned it was indorsed to the bank by Sarbach in his official capacity as grand treasurer. The solution of the question whether or not a bank is bound to take notice of the fact that money deposited with it belongs to some principal of the depositor depends upon the facts of each case (see Note, 1 L. R. A., n. s., 1110), and in view of the declared attitude of this court upon the subject it is not necessary to enter upon a review of the authorities generally.

It follows from what has been said that the instruction given the jury on the subject of notice was not

sufficiently specific for their proper guidance. This fact vitiates the general verdict and makes it necessary to reverse the judgment of the district court. Since, however, the only matter not covered by the special findings which can be relied on to sustain a recovery is not sufficient for that purpose, the cause is remanded with direction to render judgment for the defendant on the special findings of fact.