NATIONAL ACCEPTANCE COMPANY OF AMERICA, a Delaware Corporation, and Mitsubishi International Corporation, a New York Corporation, Plaintiffs,

v.

VIRGINIA CAPITAL BANK, a Virginia Banking Corporation, Defendant.

Civ. A. No. 79–0630–R.

United States District Court, E. D. Virginia, Richmond Division.

June 17, 1980.

Charles F. Witthoefft, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., for Nat. Acceptance.

Robert A. Pustilnik, Samuel & Pustilnik, Richmond, Va., for Mitsubishi.

Alexander N. Simon, Wallerstein, Goode & Dobbins, Richmond, Va., for defendant.

## OPINION AND ORDER

CLARKE, District Judge.

The plaintiffs in this diversity action are creditors of Concrete Structures, Inc., a Virginia corporation currently the subject of bankruptcy proceedings under Chapter XI of the Bankruptcy Act. Claiming a prior, perfected security interest in certain funds deposited in various deposit accounts maintained by Concrete Structures in the Virginia Capital Bank, they allege that the Bank wrongfully appropriated these funds to set off certain debts owed to the Bank by Concrete Structures. The matter comes before the Court on the Bank's motion for summary judgment against one of the plaintiffs, Mitsubishi International Corporation, on the ground that by its conduct prior to these setoffs, Mitsubishi waived whatever security interest it may have had in these funds.

The following facts are undisputed. For some period prior to April 1976, Mitsubishi had been selling steel products to Concrete Structures on open account. Concrete Structures fell behind in its payments on this account and in April 1976, it issued a note promising to pay Mitsubishi the sum of $210,415.20 by July 23, 1976, according to a schedule of payments established in the note. However, Concrete Structures soon failed to meet this schedule of payments and on June 1, 1976, Concrete Structures and Mitsubishi entered into a security agreement to secure "payment and performance of all liabilities and obligations of [Concrete Structures] to [Mitsubishi] of any kind and description, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and howsoever evidenced or acquired and whether

joint, several or joint and several. . . ."

Under this agreement, Mitsubishi acquired a security interest in:

(a) Debtor's inventory including all goods and merchandise, raw materials, goods in process, finished goods, goods in transit now owned or hereafter acquired *and the proceeds thereof.*

(b) Debtor's accounts receivable and notes receivable and contract rights including all sais [sic] acccounts [sic] receivable and notes receivable and contract rights outstanding as of this date and all future accounts receivable and notes receivable, and contract rights *and proceeds thereof.*[1]

Other pertinent provisions of this Agreement were as follows:

The Debtor will keep the Collateral free from any adverse lien, security interest or encumbrance (except as mentioned or provided for herein), and in good order and will not waste or destroy the Collateral or any part thereof.

Until default, the Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Agreement and not inconsistent with any policy of insurance thereon.

Upon default by the Debtor in the performance of any covenant or agreement herein or in the discharge of any liability to the Secured Party, or if any warranty should prove untrue, the Secured Party shall have all of the rights and remedies of a secured party under the Uniform Commercial Code or other applicable law and all rights provided herein or in any other applicable law and all rights provided herein or in any other applicable security agreement or instrument, all of which rights and remedies shall, to the full extent permitted by the law, be cumulative. The waiver of any default hereunder shall not be a waiver of any subsequent default hereunder shall not be a waiver of any subsequent default. [sic]

Debtor shall be in default under this agreement and all Liabilities of Debtor to Secured Party shall, without demand or notice of any kind and notwithstanding the maturity date or dates expressed in any evidence of any Liabilities, become immediately due and payable upon the happening of any of the following events or conditions:

(a) Default in the punctual payment or performance of any Liability referred to herein, or any part thereof;

(b) Default in the punctual performance of any covenant or agreement contained in or referred to herein;

(c) Any warranty, representation or statement made or furnished to Secured Party by or on behalf of the Debtor proves to have been false in any material respect when made or furnished;

(d) Loss, theft, substantial damage, destruction, encumbrance, to or of any of the Collateral;

(e) Insolvency of Debtor;

(f) Such a change in the management or change in ownership of capital stock of Debtor or change in any other of Debtor's affairs, financial or otherwise, as in the opinion of Secured Party impairs Secured Party's security or increases its risk.

In the early part of 1978, Concrete Structures opened three deposit accounts with Virginia Capital Bank, including the two accounts at issue in this litigation. Thereafter, on March 21, 1978, the Bank loaned Concrete Structures $40,249.92, payable in installments over a two-year period. The Bank took as security nineteen vehicles listed in an accompanying security agreement. On April 4, 1978, the Bank made a demand loan of $12,000 to Concrete Structures. This loan was unsecured. A third loan, in the amount of $50,000, was made by the

1. In a later subordination agreement between Mitsubishi and the other plaintiff, National Acceptance Company of America (NAC), Mitsubishi's security interest in inventory and in accounts and contract rights, both present and future, arising from the sale of concrete blocks manufactured by Concrete Structures was subordinated to NAC's security interest. This subordination agreement was entered into in October 1977 and was perfected on December 8, 1977.

Bank on or about April 27, 1978. While the plaintiffs urge that this loan was made not to Concrete Structures, but to a sister corporation, Concrete Erectors, this issue need not be reached on the present motion. For purposes of ruling on this motion, the Court may assume that this last loan was attributable to Concrete Structures. The Bank concedes that, while this April 27 loan ostensibly was secured by an interest in Concrete Erector's accounts receivable, this security interest was never perfected.

Beginning on or about May 30 or June 1, 1978, the Bank set off various amounts of money against Concrete Structures' deposit accounts to satisfy that company's obligations to the Bank under the loans described above. The last such setoff was accomplished on June 19, 1978. Concrete Structures filed a petition for bankruptcy on June 28, 1978. These setoffs were accomplished without notice to either of the plaintiffs. In this action, the plaintiffs' claim that that these accounts contained proceeds from the sale of inventory and other collateral.

Throughout the period, June 1976 to June 1978, despite Concrete Structures' delinquent payment of its accounts, Mitsubishi continued to supply Concrete Structures with steel products and made no attempt to enforce its security interest under the June 1, 1976, agreement. On June 23, 1978, however, Mitsubishi dispatched a telegram to Concrete Structures' president stating:

> Virtue of your default in payments of a promisory [sic] note dated April 1976 and a security agreement dated June 1976 demand is hereby made for payment of the balance due on the aforesaid note and all subsequent obligations, infull [sic], by June 28, 1978, it being the intention of Mitsubishi International Corporation to institute a suit to foreclose on the collateral set forth in the above mentioned security agreement.

The gist of the Bank's argument in support of its motion for summary judgment is that by the terms of the June 1976 security agreement between Mitsubishi and Concrete Structures, and through Mitsubishi's conduct, Mitsubishi waived any prior security interest it might otherwise have had in the funds in the deposit accounts set off by the Bank. Specifically, the Bank notes that under the terms of the security agreement, Concrete Structures retained the right, until default, to retain possession of all collateral and to "use it in any lawful manner not inconsistent with" the agreement. From this language the Bank concludes that "Mitsubishi had no right to any of Concrete Structures' property or proceeds thereof until default. . . ." Though technically default may have occurred as early as June 1976, the Bank argues that by not enforcing its rights against the collateral and by continuing to supply Concrete Structures with steel products until June 1978, Mitsubishi waived any default which may have occurred prior to June 23, 1978, when Mitsubishi dispatched its telegram to Concrete Structures formally declaring default. Thus, the Bank concludes, Mitsubishi had no enforceable interest in the proceeds deposited in Concrete Structures' accounts at the time of the setoffs prior to June 23, 1978.

 The logic of this argument is fatally flawed, and fails to appreciate the nature of Mitsubishi's interest in the collateral. Under Virginia law, to which we must turn for guidance in this diversity action, Mitsubishi's interest in the proceeds deposited in Concrete Structures' accounts at the time of the challenged set-offs is determined by reference to Article 9 of the Uniform Commercial Code, as adopted at Code of Virginia 1950, as amended, § 8.9–101 *et seq.* Under the UCC, a secured creditor clearly may not enforce his interest in collateral until such time as the debtor defaults. *See* UCC § 9–501(1) & (2); Code of Virginia 1950, as amended, § 8.9–501(1) & (2).[2] However, this is not to say that,

---

2. Code of Virginia 1950, as amended, § 8.9–501(1) & (2) provides:

(1) *When a debtor is in default under a security agreement,* a secured party has the

rights and remedies provided in this part, and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose, or

until the debtor defaults, a secured party has no rights in the collateral sufficient to defeat the claims of other creditors to the collateral. The secured party's rights against conflicting claims to the collateral are determined not by the default of his debtor or his recognition thereof, but by the extent of his compliance with the various provisions of Article 9 governing the attachment and perfection of security interests and the priority of conflicting interests. We must assume for purposes of this motion that the funds in the accounts were identifiable cash proceeds of collateral in which Mitsubishi had a perfected security interest, that the security agreement and financing statement covered the original collateral, and that the Bank had notice, of this interest. Mitsubishi would, therefore, have acquired a continually perfected security interest in these proceeds at the moment Concrete Structures acquired rights in them, whether or not the debtor was in default. Code of Virginia 1950, as amended, § 8.9–306(3).[3] Under these circumstances, this perfected security interest would be sufficient to defeat the claims of unsecured creditors to these proceeds, including the Bank's right of set-off, regardless of whether we find that this determination is governed by the UCC or Virginia common-law. Code of Virginia 1950, as amended, §§ 8.9–301, 8.9–312. *See Citizens Nat. Bank of Whitley County v. Mid-States Development Co.*, 380 N.E.2d 1243 (Ind.App.1978); *Associates Discount Corp. v. Fidelity Union Trust Co.*, 111 N.J.Super. 353, 268 A.2d 330 (1970); *Middle Atlantic Credit Corp. v. First Penna. Banking & Trust Co.*, 199 Pa. Super. 456, 185 A.2d 818 (1962); *First Wisconsin Nat. Bank of Milwaukee v. Midland*

*Nat. Bank*, 76 Wis.2d 662, 251 N.W.2d 829 (1977); *Commercial Discount Corp. v. Milwaukee West. Bank*, 61 Wis.2d 671, 214 N.W.2d 33 (1974), holding that a bank's right of set-off is subordinate to a creditor's perfected security interest. *See also, Peoples Nat. Bank v. Coleman*, 175 Va. 483, 9 S.E.2d 333 (1940); *Federal Reserve Bank v. State & City Bank & Trust Co.*, 150 Va. 423, 143 S.E. 697 (1928); *Norfolk v. Bank of Va.*, 43 Va. (2 Gratt) 544 (1846), indicating that, under Virginia law, if the bank may be charged with notice of the interest of a third party in a deposit account, it may not apply the account to satisfy a debt owed by the depositor.

▮ The Bank urges that Mitsubishi waived its security interest in these proceeds by permitting Concrete Structures to retain possession of them and to use them in the ordinary course of its business, as provided in the security agreement. However, this argument is precluded by Code of Virginia 1950, as amended, § 8.9–205, which states, in pertinent part:

> A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. This section does not relax the requirements of possession where perfection of a security inter-

---

otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to the goods covered thereby. A secured party in possession has the rights, remedies and duties provided in § 8.9–207. The rights and remedies referred to in this subsection are cumulative.

(2) *After default*, the debtor has the rights and remedies provided in this part, those provided in the security agreement and those provided in § 8.9–207.

**3.** This section provides, in pertinent part:

(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless

. . .

(b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds; . . . . . .

est depends upon possession of the collateral by the secured party or by a bailee.

This section was intended to overrule *Benedict v. Ratner,* 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925) and to remove from the secured party the duty of "strictly policing the collateral in the collateral in the hands of the debtor," laid down in that case. *United States v. Greenwich Mill & Elevator Co.,* 291 F.Supp. 609 (W.D.Ohio 1968). "If this section is to have any real meaning, it must permit the debtor and the secured party to make some preliminary arrangements for the disposition of the collateral without invoking the doctrine of waiver." *Id.* at 614. *See also Brown & Williamson Tobacco Corp. v. First Nat. Bank,* 504 F.2d 998 (7th Cir. 1974) (per Justice Clark) (security interest not waived by debtor's commingling of proceeds in bank account); *Community Bank v. Jones,* 278 Or. 647, 566 P.2d 470 (1977) (creditor not estopped from asserting his rights under a security agreement because he did not supervise debtor's inventory). Accordingly, we find no waiver of Mitsubishi's security interest arising from its action in permitting Concrete Structures to retain possession of the collateral, including proceeds, and to use them in the ordinary course of its business.

To support its waiver argument the Bank relies on several lines of cases, none of which is applicable to the case at hand. One such series of cases establishes that the doctrine of waiver, supplementing the UCC, may preclude a secured party from enforcing his security interest, at least temporarily, as a result of his practice of accepting late payments or other deviations on the part of the debtor. *See, e. g., Klingbiel v. Commercial Credit Corp.,* 439 F.2d 1303 (10th Cir. 1971); *Pierce v. Leasing International, Inc.,* 144 Ga.App. 312, 241 S.E.2d 31 (1977); *Fontaine v. Industrial Nat. Bank,* 111 R.I. 6, 298 A.2d 521 (1973). However, these cases indicate only that where a secured party has acquiesced in a debtor's deviation from the terms of the security agreement for some period, he cannot suddenly, and without notice, insist on exact compliance with the agreement and forthwith enforce his security interest. Reason-

able notice of the secured party's insistence on strict compliance is required.

We fail to see the relevance of this point to the present facts. Nothing in these cases suggests that the secured party's security interest is abolished by his acquiescence in the debtor's deviation from the terms of their agreement, or that the priority of his interest in the collateral is diminished with respect to the claims of other creditors. This principle protects debtors from the untoward machinations of eager creditors; it in no way enhances the position of junior creditors with respect to the collateral.

Another line of cases relied upon by the Bank holds that a secured party may waive his security interest in collateral in favor of a third-party purchaser of the collateral simply by his course of dealings with the debtor. *See, e. g., Planters Production Credit Assoc. v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645 (1974); *Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d 96 (Iowa 1973); *Pieper v. First Nat. Bank,* 453 S.W.2d 926 (Mo.1970); *Clovis Nat. Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967). In *Planters Production,* for example, the plaintiff, a farmers' cooperative, had lent money to a member-farmer to finance his cotton and soybean crops. To secure this loan, the cooperative perfected a security interest in the cotton raised by the debtor. When the debtor sold this cotton to other persons and failed to apply the proceeds to reduce his obligation to the cooperative, the cooperative sued the debtor and the purchasers of the cotton. On appeal from a judgment for the purchasers, the Supreme Court of Arkansas defined the issue as whether, under the UCC, "a secured creditor may waive his security interest in collateral in favor of a third-party purchaser of the collateral simply by his course of dealing with the debtor . . .." 511 S.W.2d at 647. The court answered this question by reference to Arkansas' version of UCC § 9–306(2), similar to Code of Virginia 1950, as amended, § 8.9–306(2), which provides:

Except where this title otherwise provides, a security interest continues in col-

lateral notwithstanding sale, exchange or other disposition thereof by the debtor unless the disposition *was authorized* by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

Noting that the cooperative had a policy of permitting all its members to sell or dispose of collateral at will, and of relying upon the integrity of its members to apply the proceeds to the payment of any indebtedness, 511 S.W.2d at 649, the court held that this conduct fell within the "or otherwise" language of § 9–306(2). Accordingly, the court held that the cooperative, by its conduct, had waived its security interest in the collateral in the hands of the third-party purchasers. *Accord, Lisbon Bank & Trust Co. v. Murray, supra; Hedrick Sav. Bank v. Meyers*, 229 N.W.2d 252 (Iowa 1975).

These cases, however, and the principle stated therein, are inapplicable to the facts of this case. Initially, there is some doubt whether these decisions can be entirely justified in light of the express language of UCC § 9–205, quoted above. *See United States v. Greenwich Mill & Elevator Co., supra*, 291 F.Supp. at 613–14. This issue aside, the present case cannot be made to fit within the terms of the particular statutory provision, UCC § 9–306(2), upon which these decisions turn.

As set out above, UCC § 9–306(2), Code of Virginia 1950, as amended, § 8.9–306(2), provides that a "security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *by the debtor* unless the disposition was *authorized* by the secured party in the security agreement or otherwise." The disposition of the proceeds in this case, however, was not "by the debtor," but was accomplished by the Bank unilaterally. This disposition clearly is distinguishable from the voluntary sales or transfers at issue in *Planters Production* and the similar cases relied upon by the Bank.

Nor has the Bank offered any evidence that Mitsubishi authorized the Bank's action, whether "in the security agreement or otherwise." To the contrary, the security agreement expressly prohibited Concrete Structures from creating any further encumbrance, lien or security interest in the collateral, and authorized the debtor to use the collateral only in a manner consistent with the terms of the agreement, including the term regarding encumbrances. Far from demonstrating any practice on the part of Mitsubishi authorizing its acts, the Bank points to no instance where Mitsubishi acquiesced in any involuntary foreclosure by another creditor against its collateral. Accordingly, the Bank cannot avail itself of the exception provided by UCC § 9–306(3)(a), as recognized in the various cases it cites for support.

■ The Bank also relies upon the Supreme Court of Kentucky's decision in *Cessna Finance Corp. v. Skyways Enterprises, Inc.*, 580 S.W.2d 491 (Ky.1979). Again, however, the Bank's reliance is misplaced. In *Cessna Finance*, the court merely applied the rule stated in UCC § 9–307(1), which provides:

A buyer in ordinary course of business (subsection (9) of Section 1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

The short answer is simply that the Bank was not a buyer in the ordinary course of business. UCC § 1–201(9), Code of Virginia 1950, as amended, § 8.1–201(9), defines "buyer in the ordinary course" as follows:

"Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods *buys in ordinary course from a person in the business of selling goods of that kind* but does not include a pawnbroker. . . . "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale *but*

*does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.*

The Bank is not a buyer in the ordinary course simply because Concrete Structures was not in the business of selling the funds in its bank accounts, and because it took the proceeds in satisfaction of an antecedent indebtedness. *Cf. United States v. Greenwich Mill & Elevator Co., supra,* 291 F.Supp. at 613.

What remains of the Bank's argument in support of its motion for summary judgment is the suggestion that simply by permitting Concrete Structures to retain and use the collateral after it had technically defaulted on its obligation, Mitsubishi is estopped to enforce its security interest in the collateral against other, subordinate creditors. This position is meritless.[4] The priority of a perfected security interest is not affected by the fact that a secured party, in order to assist the debtor and to enhance the likelihood of satisfaction of any indebtedness, agreed not to declare the debtor in default. A secured creditor does not owe any duty to those holding subordinate interests to proceed to enforce his remedies. *See William Iselin & Co. v. Burgess & Leigh, Ltd.,* 52 Misc.2d 821, 276 N.Y.2d 659, 663 (1967). To hold otherwise would place an undue burden, not imposed under the UCC, upon debtors and creditors alike. Moreover, the rule which we adopt enhances the position of both prior and subordinate creditors. As the Bankruptcy Act itself recognizes, it is often in the best interest of all creditors that a financially unsound debtor continue in business with his assets intact, thereby generating revenues in excess of the value of the collateral to which both secured and unsecured creditors may look to satisfy their debtor's obligations.

For these reasons, we reject the Bank's contention that Mitsubishi, through its conduct or otherwise, waived whatever security

interest it had in the proceeds set-off by the Bank. Accordingly, its motion for summary judgment is DENIED.

---

4. This is not to say that there are no circumstances under which a secured party's conduct may estop him from asserting his prior security interest against junior creditors. An example of such a situation may be found in *Manson* *State Bank v. Diamond,* 227 N.W.2d 195 (Iowa 1975), where representations made by the plaintiff-bank's president were found to estop the bank from asserting its security interest.