No. 51,626

TULOKA AFFILIATES, INC., *Appellant,* v. SECURITY STATE BANK, *Appellee.*

(627 P.2d 816)

Opinion filed April 29, 1981.

*Goeffrey E. Lind,* of Kansas City, Kansas, argued the cause and was on the brie for the appellant.

*Charles Gentry,* of Short and Gentry, of Fort Scott, argued the cause, and *Forrest E. Short,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an action wherein a creditor under a floor plan arrangement seeks to recover proceeds from the sale of its collateral from a bank acquiring same through the debit of a checking account.

The complex factual situation must be set forth in considerable detail. At all times relevant hereto, Gary P. Heideman was the president of Country Side Travelers, Ltd., whose principal business was the retail sale of travel trailers and recreational vehicles in Fort Scott, Kansas. For simplicity's sake, Country Side Travelers, Ltd., will be referred to herein as the "trailer company." Contemporaneously, Gary P. Heideman was also president of Countryside Home Sales South, Inc., whose principal business was the retail sale of mobile homes in Fort Scott. This corporation henceforth will be referred to as the "home company." Until otherwise indicated herein, the two corporations maintained separate business facilities with noncontiguous sales lots. Heideman kept three checking accounts with defendant Security State Bank: his personal account; an account for the trailer company; and an account for the home company. A reserve account for the home company was also maintained at the same bank. Security State Bank will henceforth be referred to as the "bank."

In March, 1973, and June, 1974, the trailer company and the

bank executed security agreements and promissory notes pertaining to two camper trailers in accordance with their floor plan arrangement. The two trailers were placed on the sales lot of the trailer company. Pursuant to the written agreement of the parties thereto, the bank, upon default or breach by the trailer company, could declare any or all of its secured obligations immediately due and owing. Additionally, the bank reserved the right to offset any such default against any trailer company bank account with the defendant bank. No effort was made by the bank to perfect security interests herein.

Meanwhile, down in Oklahoma, Heideman, on behalf of the trailer company, established a floor plan arrangement with Minnehoma Financial Company relative to mobile homes (May, 1973). Minnehoma Financial Company is the predecessor in interest of plaintiff Tuloka Affiliates, Inc. Again, for the sake of simplicity, the Minnehoma-Tuloka party hereto will henceforth be referred to as the "finance company." On August 30, 1973, pursuant to said floor plan arrangement, the trailer company took possession of a 1973 Di-Sun mobile home which was placed on the sales lot of the home company. The transaction was based on a trust receipt type security agreement on the single mobile home rather than under a blanket security agreement.

Matters proceeded rather uneventfully until August 5, 1974, when the mobile home was sold to one James Barrows for $8,000, plus $240.00 sales tax. The check was made payable to the home company and placed in its regular checking account with the bank. Pursuant to the trailer company's floor plan arrangement with the finance company, Heideman notified the finance company of the sale of the mobile home and on August 8, 1974, the finance company sent a draft to the bank for payment from the trailer company's checking account. The check for the purchase of the mobile home having been deposited in the home company's account, there were insufficient funds in the trailer company's account to cover the draft. The draft was returned unpaid on August 15, 1974.

On August 13, 1974, a bank officer, during a routine collateral inspection visit to the trailer company's sales lot (which had been combined with the home company's lot in the spring or early summer of 1974) noted its collateral (the two trailers) was missing. An officer of the bank immediately telephoned Heideman

relative to the whereabouts of the trailers. Heideman advised the bank the trailers had been sold. This being a breach of their agreement, the bank advised Heideman that it was declaring the trailer company's loans due immediately. Authority was expressly granted by Heideman (although later not specifically recalled by him) to the bank to debit the home company's account for the sum due. The bank then debited $6,086.30 from said account. The funds in the home company's account were merely funds in a checking account as far as the bank was concerned, as it had no knowledge of the circumstances of the sale of the mobile home or the finance company's interest therein. Subsequently, both the home company and the trailer company were declared bankrupt.

In June of 1976 the action herein was filed by the finance company against the bank to recover the funds debited from the home company's account. Judgment was entered in favor of the bank in May of 1979 and the finance company appeals therefrom.

For the finance company to be successful herein there are essentially three hurdles it must overcome. The finance company must establish: (1) It had a valid security interest in the mobile home; (2) the funds in question in the home company's bank account were "identifiable proceeds" from the sale of the secured mobile home as contemplated by K.S.A. 84-9-306(2) (since amended); and (3) by virtue of the circumstances involving the acquisition of such funds by the bank, the finance company was entitled to have the bank return the finance company's portion of such funds.

The finance company's security interest in the mobile home is challenged by the bank in many respects, which include alleged deficiencies in the instruments themselves, their execution, and the filing of the security interest. We will for the moment assume that the finance company had a duly perfected security interest, and proceed to the "identifiable proceeds" question.

K.S.A. 84-9-306 provides:

"84-9-306. 'Proceeds'; secured party's rights on disposition of collateral. (1) 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds.' All other proceeds are 'non-cash proceeds.'

"(2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security

agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

"(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless

"(*a*) a filed financing statement covering the original collateral also covers proceeds; or

"(*b*) the security interest in the proceeds is perfected before the expiration of the ten-day period.

"(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest

"(*a*) in identifiable noncash proceeds;

"(*b*) in identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings;

"(*c*) in identifiable cash proceeds in the form of checks and the like which are not deposited in a bank account prior to the insolvency proceedings; and

"(*d*) in all cash and bank accounts of the debtor, if other cash proceeds have been commingled or deposited in a bank account, but the perfected security interest under this paragraph (*d*) is (*i*) subject to any right of setoff; and (ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings and commingled or deposited in a bank account prior to the insolvency proceedings less the amount of cash proceeds received by the debtor and paid over to the secured party during the ten-day period.

"(5) If a sale of goods results in an account or chattel paper which is transferred by the seller to a secured party, and if the goods are returned to or are repossessed by the seller or the secured party, the following rules determine priorities:

"(*a*) If the goods were collateral at the time of sale for an indebtedness of the seller which is still unpaid, the original security interest attaches again to the goods and continues as a perfected security interest if it was perfected at the time when the goods were sold. If the security interest was originally perfected by a filing which is still effective, nothing further is required to continue the perfected status; in any other case, the secured party must take possession of the returned or repossessed goods or must file.

"(*b*) An unpaid transferee of the chattel paper has a security interest in the goods against the transferor. Such security interest is prior to a security interest asserted under paragraph (*a*) to the extent that the transferee of the chattel paper was entitled to priority under section 84-9-308.

"(*c*) An unpaid transferee of the account has a security interest in the goods against the transferor. Such security interest is subordinate to a security interest asserted under paragraph (*a*).

"(*d*) A security interest of an unpaid transferee asserted under paragraph (*b*) or (*c*) must be perfected for protection against creditors of the transferor and purchasers of the returned or repossessed goods."

"Identifiable proceeds" in section (2) above is not defined by

the Uniform Commercial Code and has not previously been construed by this court.

Were the funds debited by the bank a portion of the proceeds from the sale of the mobile home? The answer must be in the affirmative. There is no dispute over the fact that the proceeds from the sale, in the amount of $8,240, were deposited in the home company's checking account on August 9, 1974. The bank statement for the account during the relevant time shows the following in pertinent part:

| Date | Debits | Deposits | Balance |
|---|---|---|---|
| 8-1-74 | | | $372.90 |
| 8-2-74 | | | 346.61 |
| 8-5-74 | | | 33.37 |
| 8-6-74 | | | 14.37 |
| 8-7-74 | | | 2.01– |
| 8-8-74 | | | 4.61– |
| 8-9-74 | | | 16.37– |
| | | | 256.36– |
| | | $ 250.85 | |
| | | 8,240.00 | 8,234.49 |
| 8-13-74 | $6,086.30 | | 2,148.19 |

The $8,240 deposit on August 9, 1974, was the proceeds of the mobile home. The bank's debit of $6,086.30 could only have come in whole or in substantial part from the proceeds of the sale.

We must conclude that although the proceeds were not deposited in the debtor corporation's account, they were identifiable in the home company's account, and deposit in the companion corporation's account cannot defeat their identifiability.

We turn then to the ultimate question of whether the bank under the totality of the circumstances, is obligated to return the funds to the finance company. The vast bulk of litigation in this area arises from one of two situations (or a combination thereof). The first is where a bank unilaterally seizes funds in a debtor's account through its right of setoff. In such circumstances, collateral is sold and the proceeds placed in the debtor's account. The bank, exercising an antecedent right of setoff, seizes such funds in payment of a debt owed to the bank by the debtor. Two different rules have evolved—the "legal rule" and the "equitable rule." These were discussed in *Commercial Disc. Corp. v. Milw. Western Bank*, 61 Wis. 2d 671, 680-681, 214 N.W.2d 33 (1974), as follows:

"The right of a bank to apply the funds of a third person deposited in the

debtor's name on the debtor's obligation to the bank is discussed in 8 A.L.R.3d at page 235. The annotation states that it is the well-settled rule that if a bank actually knows that sums deposited in the account of one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to it. A bank is also denied the right of setoff where it has knowledge of circumstances sufficient to necessitate inquiry concerning the sums.

"However, the courts are divided about the bank's right to setoff funds belonging to a third person where the bank lacks knowledge of such claim or knowledge of facts requiring it to inquire about such sums. A considerable number of courts permit setoff in this situation.

"A growing number of courts, however, follow the 'equitable' rule that even if a bank lacks knowledge that the deposited sums belong to a third person and lacks knowledge of facts necessitating further inquiry, it cannot apply the funds against the debtor's obligation where it has not changed its position or has no superior equities. This rule, according to the annotation, is followed in Colorado, Indiana, Michigan, Minnesota, Nebraska, Oklahoma, Pennsylvania, South Carolina, South Dakota, and Texas. The federal courts are split, some applying the 'equitable' rule and others applying the rule that without knowledge a bank is entitled to setoff. This split is occasioned by conflicting interpretations of United States Supreme Court cases on the subject. In an early case the supreme court enunciated the equitable rule. In three later cases the supreme court denied setoff where the bank had actual knowledge. The lower federal courts have split in their interpretation of these cases. Those following the equitable rule have relied on the *Bank of Metropolis Case* [47 U.S. (6 How.) 212, 12 L.Ed. 409] and have confined the later cases to their facts."

The seizure of funds through right of setoff presents a unique situation. The debtor through authority of his secured creditor sells collateral, the proceeds of which are placed in the debtor's bank account. Before the secured creditor receives its share of the proceeds, a third party (the bank), by virtue of an earlier unrelated transaction with the debtor, unilaterally moves into the account, seizing the proceeds. The removal of funds from the account cannot be in the debtor's usual course of business as he has not removed the funds from the account.

The funds in question here, however, did not come into the bank's hands through any right of setoff. True, the bank had a right of setoff against the debtor trailer company, but it had no such right against the home company. The funds were debited solely on the express authority of the president of the home company, and their taking was not through any right of setoff. Accordingly, cases relative to proceeds taken by setoff are inapplicable herein.

The second major category of cases dealing tangentially with the subject before us includes those where a secured creditor is

attempting to gain possession of identifiable proceeds from the sale of secured collateral from a debtor involved in insolvency proceedings. The creditor's proceeds are in the debtor's possession, but the bankruptcy has placed a legal cage over the debtor's assets. If the creditor can adequately trace the proceeds it may recover them pursuant to K.S.A. 84-9-306 (4), above cited. This is not the situation before us. The debtor corporation and its companion corporation went into bankruptcy subsequent to the events herein, but the creditor is not claiming proceeds in the bankrupt's estate or asserting any claim against the bank as a result of the bankruptcy.

What claim then can the finance company make against the bank? The debtor was clearly "robbing Peter to pay Paul," but that does not create an absolute liability in "Paul" to repay "Peter." In the facts before us the finance company (Peter) authorized the debtor to possess its money. The debtor also had a legitimate debt owed the bank (Paul). The bank had no knowledge or way of knowing that the money received by it from its debtor belonged to the finance company. Heideman had authority as president of the home company to instruct the bank to debit the home account to pay the debt. The fact Heideman authorized a debiting of the account as opposed to writing the bank a check from the account can have no bearing on the finance company's right to recover.

As noted in section (2) (c) of the Official UCC Comment following K.S.A. 84-9-306:

"(c) Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party."

There is no claim of fraud or collusion between the bank and Heideman to defeat the secured interest herein. The bank was not using any intimate knowledge of the debtor's financial situation for gain and acted in good faith. The bank routinely learned its collateral had wrongfully been disposed of by its debtor. In accordance with its prior agreement with the debtor it had a right to demand payment. In response to the demand its debtor paid the debt. Under the totality of the circumstances herein the finance company has no right of recovery against the bank.

At first blush this result may appear harsh, but upon reflection it is not. The finance company entered into a floor plan arrangement with a debtor who was not in the business of selling that type of merchandise. The collateral was immediately placed on the sales lot of a companion corporation which was in the business of selling such merchandise, where it remained almost a year before its sale by the companion corporation. In essence, the finance company was dealing with the wrong corporation. A modicum of diligence on the part of the finance company would have avoided many of the problems encountered herein, as even the most perfunctory collateral check by the finance company would have alerted it to the true situation. As concluded in Oldfather, *Floor Plan Financing Under Article 9 of the Uniform Commercial Code,* 14 Kan. L. Rev. 571, 591 (1966): "[T]he floor plan financer's best security is obviously an honest dealer with a going business."

By virtue of this result it is unnecessary to determine the numerous issues raised relative to whether the finance company had a valid security interest.

The judgment is affirmed.

PRAGER, J., dissenting.

I respectfully dissent from the majority opinion's conclusion that the bank should be allowed to defeat the finance company's secured interest in the proceeds from the sale of collateral. The majority discusses the interrelationship between the bank's right of setoff and the creditor's security interest, but fails to define the status of that relationship under Kansas law today. Instead, the majority simply concludes that the debit occurred in the ordinary course of business and without notice of conflicting claims. I cannot agree.

Assuming the finance company's security interest is properly perfected, the bank is entitled to the funds only if it is able to establish that its statutory right of setoff under K.S.A. 9-1206 is superior to the perfected security interest under Article 9 of the Uniform Commercial Code, or that the bank received the money in the ordinary course of business under K.S.A. 1980 Supp. 84-1-201(9).

The majority recognizes that other jurisdictions have reached

conflicting conclusions as to the relative priority between bank setoffs and perfected security interests. The majority opinion notes the two prevailing theories: (1) The "legal rule" which prohibits a bank from exercising its right of setoff only when it has knowledge of a third party's interest in the funds in the debtor's account, and (2) the "equitable rule" which prohibits a bank from applying funds to a depositor's *antecedent* debt, despite lack of knowledge of any conflicting claims to the funds, if the bank has not changed its position or has no superior equities. Early Kansas cases held that actual knowledge by the bank of a third party's claim to funds in the debtor's account precluded setoff. See, *e.g., Gunn v. Bank,* 97 Kan. 404, 155 Pac. 796 (1916); *Tough v. Bank,* 89 Kan. 583, 132 Pac. 174 (1913); *Kimmel v. Bean,* 68 Kan. 598, 75 Pac. 1118 (1904). In *Williams v. Hanston State Bank,* 140 Kan. 260, 36 P.2d 84 (1934), the bank was precluded from applying funds deposited in its debtor's account to that debt, where it was charged with knowledge of a third party's interest in those funds. Plaintiffs had purchased land from the debtor-depositor, and the transfer of ownership was published in the local newspaper. The land was subject to oil leases, and rentals had been routinely deposited in debtor's account. After the sale and publication, the oil company, through error, made a deposit for rentals to the debtor's account, which should have been paid to the purchaser. The bank thereafter applied the funds to a debt owed to them by the debtor. The court denied the bank authority to apply the funds to the antecedent debt, citing 13 A.L.R. 334:

"Where the bank, although having no actual notice of the character of funds deposited with it, has knowledge of circumstances such as are regarded as sufficient to necessitate inquiry upon its part, the general rule is that the bank cannot, as against the true owner, set off such funds against the individual indebtedness of the depositor to the bank." 140 Kan. 266.

Just as publication imparts constructive notice (see, *e.g.,* K.S.A. 60-307), the filing of Article 9 financing statements constitutes notice to the entire world of the secured party's interest in collateral. *Allis-Chalmers Cred. Corp. v. Cheney Investment, Inc.,* 227 Kan. 4, 10, 605 P.2d 525 (1980). The purpose of UCC filing requirements for the perfection of security interests, then, is to give notice of the secured party's interest to all third parties dealing with the subject matter of the security interest. Once the

security interest is perfected by filing, a bank would be charged with notice, and thus, its right of setoff would be properly subordinated to the security interest.

Under Kansas law, the finance company had an interest in the funds deposited in the home company's account. The interest of a secured creditor in the proceeds from the sale of the collateral is provided for in K.S.A. 1980 Supp. 84-9-306(2). The UCC has two other provisions which support the subordination of a statutory right of setoff to an Article 9 perfected security interest in the proceeds of the collateral. K.S.A. 1980 Supp. 84-9-104(*i*) excludes from the article "any right of setoff." K.S.A. 84-9-310 gives priority to mechanics' liens for work or services necessary for the preservation of the collateral. See, Kansas Comment to 84-9-310. K.S.A. 84-9-201 establishes the validity of a security interest against third parties, *unless the Code provides otherwise.* There is nothing in Article 9 to suggest a perfected security interest is subordinate to a right of setoff. Had the legislature intended to subordinate the security interest to setoffs, it could have so provided in a manner similar to the 84-9-310 priority given to mechanics' liens.

Other jurisdictions have also concluded that a bank's right of setoff is subordinate to a perfected security interest. In *Nat. Acceptance Co. of America v. Va. Capital Bank,* 498 F. Supp. 1078 (E.D. Va. 1980), the court discussed the 9-104(i) exclusion of setoffs from Article 9, and concluded that the statute clarified the status of a bank with a right of setoff as that of a general creditor, rather than a secured creditor with priority under Article 9. In *Citizens Nat. Bank v. Mid-States Dev. Co.,* _____ Ind. App. _____, 380 N.E.2d 1243 (1978), the court relied on UCC § 9-201 which gives priority to a secured party over anyone, unless such priority is set forth elsewhere in the Code. Subordination of the bank's right of setoff to perfected security interests is thus supported in Kansas law, as well as other jurisdictions considering the interrelationship of setoff rights with UCC Article 9 perfected security interests.

As noted previously, a bank's authority to set off funds in a depositor's account against an antecedent debt is authorized in K.S.A. 9-1206. The right of setoff, however, requires *mutuality of obligations* between the bank and the depositor. *Docking v. Commercial National Bank,* 118 Kan. 566, 568, 235 Pac. 1044

(1925); 10 Am. Jur. 2d, Banks § 666, p. 635. Without determining priority between setoffs and security interests, it is clear that, in the present case, the bank could not have exercised its right of setoff against the home company account, as the debt was owed by the trailer company, and there was therefore no mutuality of obligations.

The majority also concludes that the debit was not really a setoff, but a transfer in the ordinary course of the bank's business, particularly since the majority found no indication of the bank's knowledge of any third-party interest to the funds. It is difficult to distinguish this transfer from a setoff. Gary Heideman, president of both the trailer and home companies, testified that he did not remember authorizing the transfer. He did admit, however, that he had the authority to make the transfer and did not object to it after receiving notice of the debit. Joe Beckham, a bank employee, testified that Heideman had previously sold secured collateral in violation of security agreements, and that the bank had told him that the next time collateral was sold in violation of those agreements, the bank would "press charges." Steven Beurge, a bank vice-president, testified that he talked with Heideman on the phone on August 13, 1974, when the bank's collateral was discovered missing from the trailer company's lot. Heideman was informed that the trailer company *had to pay* the remaining balance on the loan secured by the trailers that day. According to Beurge, at that time Heideman authorized the debit from the home company's account. The debit clearly constituted a withdrawal of funds to be applied to an antecedent debt owed to the bank. The only elements distinguishing this transaction from a setoff are the lack of mutuality of obligations and the bank's assertion that Heideman authorized the debit.

It is equally difficult to understand, both under the law and the circumstances of this particular case, how the debit could be considered as being within the ordinary course of the bank's business. The continuation of the security interest in proceeds after the sale of collateral is authorized in K.S.A. 84-9-306(2). The majority opinion cites the Official UCC Comment (2) (c) that a security interest in cash proceeds deposited in an account remains perfected until transferred in the ordinary course of business.

Other jurisdictions have relied upon this comment to find the

bank's conduct in applying a depositor's funds to an antecedent debt prohibited as outside the ordinary course of business. For example, in *Brown & Williamson T. Corp. v. First Nat. Bk. of Blue Island,* 504 F.2d 998 (7th Cir. 1974), the bank's conduct was found not to be within the ordinary course of business so as to defeat the creditor's perfected security interest in proceeds where the creditor presented its draft upon the account, the bank falsely represented to the creditor that there were insufficient funds in the account to cover the draft, and the bank then procured a debit memorandum in its favor from the debtor-depositor. In *Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville,* 358 F. Supp. 317 (E.D. Mo. 1973), the debtor authorized the bank's debit in payment of an antecedent debt for the stated purpose of defeating the creditor's security interest. Additionally, the transfer was made after business hours. Under those circumstances, the bank's conduct was "clearly outside the ordinary course of business," and did not defeat the perfected security interest. In *Anderson, Clayton & Co. v. First Am Bank,* 614 P.2d 1091, 1094 (Okla. 1980), the court interpreted the UCC Official Comment to § 9-306 to mean that "a security interest in proceeds remaining in a bank account continues until the funds are actually transferred in the ordinary course of business." The Oklahoma court found no precise definition of "ordinary course of business," but borrowed from UCC § 1-201(9) to find requirements of good faith and honesty without knowledge of preexisting claims. The bank was precluded from asserting its right of setoff where it was charged with knowledge of the preexisting security interest.

While there is no indication in the present case of either the debtor's or bank's intent to circumvent a valid security interest, the circumstances of the debit are sufficiently irregular to make the bank's conduct "outside the ordinary course of business." First, the debit was made from the account of one company to satisfy the debt of another. This should have alerted the bank that perhaps the debtor was, in fact, "robbing Peter to pay Paul." Ordinarily, a bank may comply with a verbal direction from a depositor for the dispersal of funds without liability to the bank. See, *Mathey v. Central National Bank of Junction City,* 179 Kan. 291, 294, 293 P.2d 1012 (1956) (depositor's verbal instruction to the bank justifies the bank in acting accordingly); *Tough v. Bank,* 89 Kan. 583 (depositor's verbal authorization to apply funds in

account to debt owed to the bank served the same purpose as a check); 10 Am. Jur. 2d, Banks § 496, p. 465. A bank should not, however, be able to apply funds in contradiction of a third party's interest, particularly where the dispersal is in favor of the bank. A prudent banker, under these circumstances, should have required some written authorization, since the withdrawal was from an account other than that of the debtor, and because the withdrawal was in favor of the bank.

In *National Accept. Co. of America v. Virginia,* 491 F. Supp. 1269 (E.D. Va. 1980), the bank was precluded from applying a depositor's funds to an antecedent debt as constituting conduct outside the ordinary course of business, even though there was no indication of intent to defraud the secured creditor, knowledge of the secured creditor's interest, or other bad faith. The bank had exercised its right of setoff against the debtor's bank accounts, taking funds which were proceeds subject to the creditor's security interest. The court found UCC § 1-201(9) to be applicable. That statute is identical to the Kansas counterpart, K.S.A. 1980 Supp. 84-1-201(9), and states:

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. . . . 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security [for] or in total or partial satisfaction of a money debt."

The court held that the bank's exercise of its right of setoff was not in the ordinary course of business, because the debtor was not in the business of selling funds in its accounts, and because it took the proceeds in satisfaction of an antecedent indebtedness.

The majority opinion also attempts to justify its conclusion by shifting to the secured creditor the burden of policing collateral and proceeds. Pre-Code law placed on the interest holder the duty of looking after its collateral and of seeing that the proceeds from the sale of that collateral were properly applied. See, *e.g., Farmers State Bank v. Bank of Inman,* 123 Kan. 238, 242, 254 Pac. 1038 (1927). Enactment of the UCC, however, relieves the secured creditor of this burden, as evidenced by K.S.A. 1980 Supp. 84-9-306(2), which provides for the continuation of the security interest in the proceeds after sale, and K.S.A. 1980 Supp. 84-9-

205, which validates the security interest in collateral in the possession and control of the debtor. See *National Accept. Co. of America v. Virginia*, 491 F. Supp. at 1274. The majority's chastisement of the finance company's lack of diligence in policing the collateral is therefore misplaced, especially since it is noted in the same opinion that it would be "wholly illogical" to allow the debtor to defeat a perfected security interest by depositing the proceeds in a different account.

I would hold that a bank's application of funds in a debtor's account to an antecedent debt should not be considered a transaction in the ordinary course of the bank's business so as to defeat a perfected security interest. The fact that the funds were wrongfully deposited in a different account, and that the president of both companies allegedly approved the withdrawal and application should not change the result. Accordingly, I dissent from the majority opinion that, under the totality of the circumstances, the bank was entitled to apply the secured proceeds to the trailer company's antecedent indebtedness to the bank, thereby defeating the finance company's security interest.

MILLER and HERD, JJ., join the foregoing dissenting opinion.