**FOUR CIRCLE CO–OP, et al., Plaintiffs,**

v.

**KANSAS STATE BANK & TRUST CO., Defendant and Third–Party Plaintiff,**

v.

**Christopher J. REDMOND, Trustee of the Bankruptcy Estate of Fleming Grain Co., Inc., Third–Party Defendant.**

**AD–REM TRANSPORTATION, INC. et al., Plaintiffs,**

v.

**KANSAS STATE BANK & TRUST CO., Defendant and Third–Party Plaintiff,**

v.

**Christopher J. REDMOND, Trustee of the Bankruptcy Estate of Fleming Grain Co., Inc., Third–Party Defendant.**

Nos. 89–1314–C to 89–1316–C.

United States District Court,
D. Kansas.

July 12, 1991.

As Corrected July 23, 1991.

Michael Lehman, Goering & Lehman, Wichita, Kan., for Collingwood Grain.

Michael L. Koon, Shook, Hardy & Bacon, Kansas City, Mo., for Four Circle Co-op.

Stephen B. Rhudy, Rhudy & Bradford, Lawrence, Kan., for Ad–Rem Transp., Inc.

Thomas D. Kitch, Thomas J. Lasater, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for Kansas State Bank.

Christopher J. Redmond, Trustee, Redmond, Redmond & Nazar, Wichita, Kan., for Christopher J. Redmond.

## MEMORANDUM

CROW, District Judge.

These cases arise out of the bankruptcy of Fleming Grain Company, Inc. (Fleming). In 1984, Fleming, a company which profited from the resale of grain, became financially insolvent due to the principals' losses in the commodities market. On the day Kansas State Bank and Trust Company (KSBT) learned of these losses, it set off[1]

---

1. KSBT controverts the plaintiffs' characterization of its actions as a "setoff." KSBT contends that it "applied the proceeds of accounts receivable in which it had a perfected security

the amounts owed by Fleming. This setoff caused numerous checks issued by Fleming to bounce. The plaintiffs in these cases are persons who were issued checks by Fleming but were unable to collect from the account upon which they were issued due to KSBT's setoff. The plaintiffs have received partial payments on the checks through distributions in bankruptcy.

The plaintiffs in this case are suing KSBT for conversion, alleging that KSBT wrongfully setoff against the funds in Fleming's account. The plaintiffs allege that KSBT knew that the funds in Fleming's account were their property. KSBT denies any wrongful action and challenges the plaintiffs ownership interest in the funds. KSBT named the trustee in bankruptcy as a third-party defendant, claiming that the bankruptcy estate should compensate KSBT for any amounts it may owe to the plaintiffs. The trustee challenges whether it should be liable to KSBT if the plaintiffs are successful in their conversion claim.

This case comes before the court upon KSBT's motions for summary judgment in all three cases,[2] upon the plaintiffs' cross-motion for summary judgment in Case Number 89–1316–C, and upon the trustee's motion for summary judgment against KSBT in all three cases.

### Facts [3]

Fleming Grain was founded in December 1978 by John Fleming, Tom Forenshell and K. Zack Zigler, three individuals who each had experience in the grain industry. Fleming's business consisted of purchasing grain from grain producers/sellers, and acting as middle-man, would sell the grain to buyers for a profit of approximately three to five cents a bushel (net after expenses, including the cost of transportation). Fleming's profits on its grain transactions amounted to 1.5% to 2.5% of the total resale price of the grain Fleming sold. Fleming did not raise any grain itself, nor did Fleming have grain storage capabilities.

In 1979 Fleming began banking at KSBT. From 1979 until 1984, Fleming maintained a business demand deposit checking account at KSBT.[4] The documents governing that account did not indicate that the account was "special," "trust" or "custodial". From this account, Fleming paid essentially all of its bills, including payments to grain sellers.[5]

---

interest to the indebtedness of Fleming" and only "setoff" any amounts which were not proceeds. KSBT does not attempt to demonstrate what percentage of the funds it seized from Fleming's account was "proceeds" of accounts receivable or what percentage of the funds was taken by "setoff." This may be because of one of three reasons: (1) KSBT did not think that it was significant to distinguish between the amounts setoff and the amounts that were covered by its security interest; (2) It was impossible to determine what amounts in Fleming's account were actually proceeds of accounts receivable; (3) KSBT intentionally chose not to demonstrate what percentage of the amounts in Fleming's account were proceeds as those facts may have served to aid the plaintiffs by tracing the money to the plaintiffs' sale of grain. The court notes that KSBT refers to its own actions as a "setoff." See Defendant KSBT Reply Memorandum in Support of Motion for Summary Judgment, Case No. 89–1314–C, Dk. 28. For simplicity, the court will generally refer to KSBT's seizure of funds in Fleming's account as a "setoff."

2. KSBT has filed virtually identical motions in each case. The brief filed in Case Number 89–1316–C contains additional references in support of its statement of uncontroverted facts.

3. The court has endeavored to condense all of the relevant facts into one cogent statement. Any discrepancies in the facts which the court deemed significant will be specifically noted; any of the facts not specifically addressed were deemed immaterial to the disposition of these motions.

The court pauses to note that the plaintiffs in Case Number 89–1314–C and Case Number 89–1315–C utilized a particularly cumbersome and somewhat confusing means of responding to KSBT's statements of uncontroverted facts. While the use of footnotes may sometimes be appropriate, their proliferate use in responding to statements of fact was not a particularly helpful means of presenting the facts. Although the plaintiffs' briefs comply with local Rule 206, the court would not recommend the style chosen by the plaintiffs as a paradigm for briefs in the future.

4. Fleming also maintained two other accounts at KSBT: a savings account and a checking-payroll account.

5. Fleming also paid for its losses in the commodity market out of this account.

Throughout this same time, Fleming also maintained a line of credit with KSBT. As a condition of the line of credit, KSBT required Fleming to maintain an exclusive banking relationship. As security for the line of credit, Fleming granted KSBT a security interest in its accounts receivable and proceeds therefrom and contract rights. The line of credit enabled Fleming to pay sellers of grain, notwithstanding the untimely receipt of sale proceeds. Prior to July 1984, KSBT had written several letters addressed "To Whom It May Concern" with an understanding that these letters would be forwarded to potential customers of Fleming and that the desired effect of the letters was to induce reliance by potential customers in extending credit to Fleming.

KSBT, as part of its analysis of Fleming for loan purposes, acquired a fairly detailed understanding of Fleming's operations.[6] Fleming sold plaintiffs' grain under separate contracts; plaintiffs were not parties to Fleming's contracts with third parties (the ultimate buyers of the grain). Apparently, the vast majority of all of Fleming's transactions were made on what is called a "back-to-back" agreement, whereby a purchase is not made without a confirmed buyer.

Until the beginning of 1984, Fleming was apparently a profitable enterprise. However, in the first few months of 1984, KSBT officials began to notice that Fleming was encountering financial difficulties. On July 3, 1984, Fleming was in default on two notes issued in favor of KSBT. The total principal amount of those notes was $1,200,000. On July 24, 1984, Fleming was in default on a third promissory note in the principal amount of $300,000, bringing the total principal amount on which Fleming had defaulted as of July 24, 1984, to $1,500,000.

On July 25, Fleming, Forenshell and Zigler, advised KSBT that they had lost over $1,000,000 of Fleming's assets by speculating in the commodity futures market in the principals' individual names.[7] Later that day, KSBT seized all of the funds in the Fleming account. On July 26, 1984, KSBT applied $1,235,707.93 from Fleming's business checking account at KSBT to Fleming's indebtedness to the bank.[8] On July 26, 1984, after KSBT had seized the funds in the Fleming account, KSBT demanded immediate payment from Fleming on the defaulted notes.

As a result of the setoff, the checks which Fleming had written to the plaintiffs and deposited by the plaintiffs into regular banking channels on and after July 25, 1984, were returned to the plaintiffs unpaid.

The plaintiffs in case number 89–1314–C and case number 89–1315–C are farmers or other grain suppliers who sold grain to Fleming prior to July 25, 1984. Fleming sold that grain to its customers prior to July 25, 1984. Prior to July 25, 1984, Fleming issued checks drawn on its business checking account at KSBT in payment to the plaintiffs for their grain. The total of checks is $417,658.32. The plaintiffs in case number 89–1316–C are grain suppliers and/or transportation providers who sold grain and/or transportation services to Fleming prior to July 25, 1984. The total value of the checks issued to the plaintiffs in this case is $318,895.75. Each check at issue was transmitted to the payee on the check by Fleming through the mail or by hand and was deposited for collection in the ordinary course of the payee's operations as a grain seller. Each draft at issue was transmitted by the drafting party identified on the draft to KSBT for payment by Fleming in the ordinary course of banking oper-

---

**6.** The affidavit of Audrey J. Cotton states that she informed KSBT of the relationship between Flemings' payables and receivables. Cotton states that during May, June and July 1984, she informed KSBT that Fleming was "holding the money close," meaning that Fleming was issuing as many checks as possible based on the daily cash position.

**7.** The trustee of the Fleming Grain Bankruptcy has obtained judgment against the principals of Fleming in the amount of $973,509.50 for their misuse of corporate funds for their own benefit.

**8.** At the close of regular banking business on July 25, 1984, Fleming's business checking account at KSBT held $1,235,707.93.

ations and the drafting party's operations as a grain seller.

The amount of compensatory damages claimed by each plaintiff is equal to the amount of the returned checks or drafts each plaintiff holds, plus interest, and less any reduction made by the court for partial payment received from the Fleming Trustee applicable to the checks or drafts at issue.

As of the dates the grain payment checks held by plaintiffs were issued, Fleming's business checking account balance at KSBT was sufficient to cover all the checks issued to the plaintiffs. From July 1 through July 25, 1984, when all the checks held by the plaintiffs were presented for payment, approximately 84% of all deposits to Fleming's account at KSBT were proceeds of grain sales. Fleming's account balance on July 1, 1984 was $162,112.14.

### Standard for Summary Judgment

Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

■ An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is not appropriate. *See Riley v.*

*Brown & Root, Inc.*, 896 F.2d 474, 476–77 (10th Cir.1990).

### The *Erie* Doctrine

The substantive law of the State of Kansas governs this action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). While the parties agree with this general proposition, the parties are not in total agreement as to what the law is in Kansas. The court will endeavor to provide a meaningful overview of applicable law.

### The Tort of Conversion

The Supreme Court of Kansas has discussed the tort of conversion in the context of an alleged illegal setoff of funds by a bank.

This court has defined conversion as the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights. *Carmichael v. Halstead Nursing Center, Ltd.*, 237 Kan. 495, Syl. ¶ 2, 701 P.2d 934 (1985). Generally, an action for conversion will not lie for the recovery of an ordinary debt or account. *Temmen v. Kent–Brown Chev. Co.*, 227 Kan. 45, Syl. ¶ 3, 605 P.2d 95 (1980). It is well recognized that the relationship between a general depositor and his or her bank is that of creditor and debtor, and money deposited, unless segregated into a special account and designated to be kept separate, becomes the property of the bank. *Chilson v. Capital Bank of Miami*, 237 Kan. 442, 444, 701 P.2d 903 (1985). Therefore, unless intended to remain separate, money deposited in a bank ordinarily cannot be the subject of an action for conversion. *E.g., Baker, Administrator v. Brial*, 185 Kan. 322, 341 P.2d 987 (1959); Annot., 44 A.L.R.2d 927 § 7(c), p. 943.

*Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

### The Right of Setoff

■ Bank setoff is the legal right of a financial institution to appropriate the deposit of its customer upon the customer's default and apply those funds against the customer's debts to the institution. *See Tulkova Affiliates, Inc. v. Security State Bank,* 229 Kan. 544, 627 P.2d 816 (1981). The right of setoff is an ancient doctrine tracing its origin back to the Roman doctrine of "compensatio," which is the extinction of cross-demands. *See* B. Clark, *The Law of Bank Deposits Collections and Credit Cards* ¶ 14.01 at 14–2 (3rd ed. 1990). In Kansas, the right of setoff is established by statute. K.S.A. 9–1206 provides: "Any bank shall have the right to set off any obligation or claim which it has, when the same is matured against any depositor." The right of setoff has long been recognized by Kansas courts. *See Tulkova,* 229 Kan. at 548, 627 P.2d 816; *Scharz v. Twin City State Bank,* 201 Kan. 539, 441 P.2d 897 (1968); *Tough v. Citizens' State Bank,* 89 Kan. 583, 132 P. 174 (1913); *Kimmel v. Bean,* 68 Kan. 598, 75 P. 1118 (1904).

■ Before exercising the right of setoff, certain conditions must be satisfied. First, a valid debtor-creditor relationship must exist between the bank and the depositor. *Tulkova,* 229 Kan. at 548, 627 P.2d 816. Second, the depositor's debt must be due and owing or "mature." *FDIC v. Pioneer State Bank,* 155 N.J.Super. 381, 382 A.2d 958 (1977); *see Kimmel,* 68 Kan. at 604, 75 P. 1118. Third, the funds must be the depositor's property and deposited without restrictions. *Pioneer,* 382 A.2d at 962. Fourth, there must be mutuality of obligation between the debtor and creditor, as well as between debt and funds on deposit. *See Kimmel,* 68 Kan. at 604, 75 P. 1118. *See generally The Law of Bank Deposits, Collections and Credit Cards* ¶¶ 14.01, 14.05, 14.06; Note, *Commercial Law—Bank's Right of Setoff— Iola State Bank v. Bolan,* 33 Kan.L.Rev. 569, 573 (1985). *See also F.D.I.C. v. Liberty Nat. Bank & Trust Co.,* 806 F.2d 961,

967 (10th Cir.1986) (discussing Oklahoma law).

A bank's right to setoff may be denied under certain situations where the bank has knowledge of a third party's interest in the deposited funds. Two rules have evolved: the "legal" rule and the "equitable" rule.

■ All courts, including Kansas, prohibit setoff when a bank has actual knowledge that the deposits in the debtor's account belong to a third person. *See Iola State Bank v. Bolan,* 235 Kan. 175, 188, 679 P.2d 720 (1984) *See generally* Annot., *Bank's Right to Apply Third Person's Funds Deposited* 8 A.L.R.3d 235 (1966). "A bank is also denied the right of setoff where it has knowledge of circumstances sufficient to necessitate inquiry concerning the sums." *Bolan,* 235 Kan. at 188, 679 P.2d 720 (quoting *Commercial Disc. Corp. v. Milw. Western Bank,* 61 Wis.2d 671, 680–81, 214 N.W.2d 33 (1974). This is known as the "legal" rule.

Under the equitable rule, under certain circumstances a bank may not setoff even though it has no knowledge of the interests of third parties in the funds. In order to recover under the equitable theory, the third party must demonstrate that (1) the bank's lack of knowledge has not resulted in any change in the bank's position, and (2) no superior equities have been raised in its favor. *See Commercial Disc.,* 214 N.W.2d at 37–39. Kansas has discussed, but has not expressly adopted, the equitable rule.

The plaintiffs contend that *Bolan* precludes summary judgment.[9] The plaintiffs contend that the facts of *Bolan* are virtually indistinguishable from the facts of this case and that any facts that are different only indicate that KSBT's behavior in this case is more reprehensible. The plaintiffs extol the virtues of the *Bolan* case and note that the case has been frequently cited by the Kansas appellant courts.

KSBT contends that *Bolan* is an aberration of Kansas law which has been the subject of criticism by legal scholars and

---

**9.** Ad–Rem Transportation, the plaintiffs in case number 89–1316–C contend that *Bolan* is dispositive in this case, entitling them to summary judgment.

should be limited to its specific facts.[10] KSBT acknowledges that *Bolan* has been cited on many occasions by Kansas appellate courts, but contends that the central holding of that case has not been followed in subsequent cases. KSBT contends that even under *Bolan* it is entitled to summary judgment.

### The *Bolan* Case

In *Bolan*, decided March 24, 1984, Biggs Feed and Grain, Inc. (Biggs) operated a feed and grain elevator at Waverly, Kansas, and conducted its banking business with the Iola State Bank (Bank). Biggs purchased and sold grain.[11] The Bank financed the grain operation since its inception in 1974. Biggs executed a promissory note on February 13, 1981, in the sum of $294,000 with interest at a rate of 17%. Security agreements were executed granting the Bank a security interest in all inventory of seed and grain and a purchase money security interest in all wheat, soybeans and feed grains owned or acquired by Biggs.

Biggs did not make any principal or interest payments on the note, which became due on July 1981. Examiners of the Bank criticized the Biggs' indebtedness and the Bank assured the examiners that the Biggs matter would be taken care of within 90 days. After the discussion with the bank examiners, the Bank met with Biggs to inform him that the note was past due and that he had 90 days from the bank examination, to the middle of October, to find other financing or a buyer of the business. The Bank discovered that its deadline fell during the middle of soybean harvest. At Biggs' request, the deadline was extended to November 15, 1981.

The November 15, 1981, deadline passed; Biggs failed to respond to the Bank's demand for payment. On December 7, 1981, checks issued by Biggs to farmers/sellers for past grain sales began to arrive at the Bank. At the time those checks were issued there were sufficient funds in the

Biggs' account to cover all outstanding checks. The Bank setoff Biggs' general checking account and applied the funds against the balance due on Biggs' note. At the time of the setoff, proceeds from Biggs' resale of grain constituted 95% of all deposits in the account. On the same day as the setoff, the Bank filed suit against Biggs, its principal and the guarantors of the note. The farmers/sellers intervened in the suit alleging that the Bank had converted their money.

The case was tried to a jury. At the close of the evidence, the district court directed a verdict in favor of the farmers/sellers for $26,663.14. The district court held that Biggs had only a voidable title in the grain, and that when the Bank dishonored Biggs' checks given for payment of the grain, the Bank voided Biggs' title and returned title to the farmers/sellers. The district court also concluded that the Bank knew the nature of the funds in Biggs' bank account and that the setoff was a willful act of conversion of the farmers/sellers' property. On the issue of punitive damages, the jury awarded the farmers/sellers $150,000.

On appeal, the Supreme Court affirmed the award of both compensatory and punitive damages, concluding that the district court had reached the correct result, but for the wrong reason. The court concluded that the adoption of the U.C.C. abolished the cash sale doctrine. The court then proceeded to analyze whether the Bank had acted in good faith: (1) The farmer's tender of delivery of the grain was conditional upon payment, and Biggs, a merchant, acquired voidable title to the grain under K.S.A. 84–2–403; (2) The Bank's security interest attached to the grain; (3) The Bank was a purchaser as defined by K.S.A. 84–1–201(33); (4) Biggs' sale of the grain to good faith purchasers in the normal course of business defeated the Bank's title to the grain, but the proceeds of the grain sales were identifiable cash proceeds; (5) as a

---

10. The court notes that Barkley Clark, one of the harshest critics of the *Bolan* decision, filed an *amicus* brief on behalf of the Kansas Bankers Association in that case.

11. Biggs business was similar in the Fleming operation, although it appears that Biggs did have an elevator to store the grain.

secured creditor, the bank had a right to the proceeds of the grain sales and had a right to the money deposited in Biggs' checking account.

The farmers/sellers argued, and the Supreme Court agreed, however, that the Bank had failed to act in good faith as required by the U.C.C., and was therefore not a "good faith purchaser." K.S.A. 84–1–201(19) defines "good faith" as meaning honesty in fact in the conduct or transaction concerned. Since the Bank failed to act in good faith, it was not a good faith purchaser, and its security interest did not attach against the farmers/sellers. In determining that the Bank had not acted in good faith, the Supreme Court relied on several facts including: (1) the size of Biggs' debt and the fact that he had never made a payment; (2) The Bank knew that Biggs would not be able to pay the note; (3) The Bank extended the 90–day limitation to pay the loan to coincide with the harvest season; (4) The Bank knew that the funds setoff in the Biggs' account were funds from sales of grain harvested by the farmers; (5) The Bank knew how Biggs conducted the operations of purchasing and selling grain.

The Supreme Court then commented:

Since the Bank's security interest did not attach against the farmers/sellers, what is their relationship? Under the UCC a drawee is not liable to the holder of a check until it is accepted by the drawee. The UCC does not affect the Bank's liability to the farmers/sellers in contract, tort or otherwise by its failure to accept the check when presented for payment. K.S.A. 84–3–409. Under normal circumstances, when the farmers/sellers sold the grain to Biggs and Biggs' bank dishonors Biggs' checks payable to the farmers/sellers, in spite of sufficient funds and in absence of a stop order, the farmers/sellers had no direct recourse against Biggs' bank until the Bank accepted the check for payment. The UCC continues the prior law that there is no privity between the holder of a check and the drawee bank, assuming

no certification or retention of the check beyond the midnight deadline.

235 Kan. at 187, 679 P.2d 720.

The Bank argued in the alternative that if it was not entitled to the funds under the U.C.C., it was entitled to the funds under the common law and K.S.A. 9–1206. After reviewing the law in regard to setoff, the court concluded:

A holder cannot sue the drawee bank for wrongful dishonor of an insolvent depositor's check just because the bank dishonors the check in order to protect its own interest. Where a bank knows sums deposited in the account of one of its depositors belongs to a third party, it does not act in good faith when it applies such funds of the third party against the depositor's debts to the bank. Under such circumstances the third party has an action directly against the bank for conversion of the third party's funds from the debtor's accounts.

235 Kan. at 189, 679 P.2d 720.

In concluding that the bank had actual knowledge that the funds in Biggs' account belonged to third parties, the court relied on the statements made by a bank employee during trial which conceded that the money in the account belonged to the plaintiffs. 235 Kan. at 191, 679 P.2d 720. The court concluded that this admission, coupled with the Bank's knowledge of how Biggs operated, indicated actual knowledge. "Where a Bank actually knows the sums deposited in the account of one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to the bank. The setoff was improper under K.S.A. 9–1206." *Id.*

The Supreme Court also concluded that the award of punitive damages was appropriate.

### Discussion and Disposition

■ For whatever reason, the plaintiffs in this case are unable to trace the proceeds of the sale of their grain to funds in Fleming's account at KSBT. The court concludes that the failure to demonstrate a sufficient property interest in those funds compels summary judgment in favor of KSBT, as the plaintiffs have failed to demonstrate a necessary element of their case.

The plaintiffs repeatedly assert that the money in Fleming's account on July 25, 1984 is "their" money. Unfortunately for the plaintiffs, they are unable to demonstrate that the money in the account is the proceeds of the sale of their grain. As KSBT suggests, there is no evidence in the record indicating the source of the money in the account. The plaintiffs have not traced the funds in the account to Fleming's purchase of their grain.[12]

Proof of ownership in the funds in the Fleming account is essential to the plaintiffs' claims. "[T]he plaintiff in a conversion action assumes the burden of proving a sufficient interest in the property allegedly converted." *Security Nat. Bank v. Belleville Livestock*, 619 F.2d 840, 849 (10th Cir.1980) (applying Kansas law). As noted above, the account was not designated for a specific purpose.

The plaintiffs essentially argue that *Bolan* alleviates grain sellers holding checks dishonored by the bank (after a purportedly wrongful setoff) of the burden of proving ownership in the allegedly converted funds. It is the plaintiffs' position that a bank's knowledge of the source of funds in an account (i.e., grain sales) simply allows the plaintiffs to side-step the issue of ownership by merely presenting the dishonored check to the court, and upon proving bad faith, automatically collect compensatory and punitive damages from the bank. Simply put, *Bolan* does not stand for that proposition. In *Bolan*, the bank did not dispute the plaintiffs' ownership interest in the account funds. Therefore, the proof of ownership element of the plaintiffs' case was satisfied and uncontested. The court in *Bolan* appears to acknowledge that the plaintiffs must prove ownership interest in the funds. 235 Kan. at 189, 679 P.2d 720.

In the case at bar, KSBT has put the plaintiffs to the task of proving ownership in the funds, a burden they are unable to shoulder. Because the court concludes that the plaintiffs have failed to establish an element of their cause of action, the court need not reach the issue of whether KSBT acted in bad faith in exercising its right of setoff.

■ The plaintiffs urge the court to accept its argument that once the checks were issued to the plaintiffs, the funds in Fleming's account were converted from proceeds of accounts receivable (from grain buyers) into funds committed for accounts payable (to plaintiffs) in which KSBT had no interest, and that KSBT agreed to this transition in form, particularly when Fleming was "holding the money close." This argument simply ignores K.S.A. 84–3–409, which provides in pertinent part:

(1) A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.

(2) Nothing in this section shall affect any liability in contract, tort or otherwise arising from any letter of credit or other obligation or representation which is not an acceptance.

### OFFICIAL UCC COMMENT

.    .    .    .    .

1. As under the original sections, a check or other draft does not of itself operate as an assignment in law or equity. The assignment may, however, appear from other facts, and particularly from other agreements, express or implied; and when the intent to assign is clear the check may be the means by which the assignment is effected.

.    .    .    .    .

### KANSAS COMMENT 1983

.    .    .    .    .

(2) Makes clear that this section does not affect liability which may arise apart from the instrument. Examples of such liability are: Ballard v. Bank, 91 K. 91, 136 P. 935 (1913) (foundation for long line of Kansas decisions) ...

---

**12.** The court recognizes that to an extent money is fungible. However, the court concludes that to survive summary judgment, the plaintiffs must present evidence by which the trier of fact could conclude by a preponderance of the evidence that they had a sufficient interest in the funds. Upon the evidence presented, it is merely speculation that the funds in the Fleming account were the proceeds of these plaintiffs' sale of grain.

This section makes it clear that the drawing of a check or other draft does not operate "of itself" to transfer to the payee *pro tanto* the funds in the account.

. . . . .

Most important, if a seller sells goods to a buyer and the buyer's bank dishonors the buyer's check payable to the seller in spite of sufficient funds and the absence of a stop order, the seller has no direct recourse against the buyer's bank. The best that the seller can do is to move against the buyer on the check or on the underlying obligation; the buyer can then move against his bank for wrongfully dishonoring an item that was "properly payable." See 84–4–402. In short, this section continues prior law in recognizing not one ounce of privity between the holder of a check and the drawee bank, assuming no certification and no retention beyond the midnight deadline. Nor can the holder sue the drawee bank for wrongful dishonor of an insolvent depositor's check just because the bank dishonored the item in order to protect its own interests. In such a case, the holder's recourse is against the drawer and any indorsers ...

The position urged by the plaintiffs is simply irreconcilable with the law of Kansas.

Nor have the plaintiffs attempted to demonstrate in a meaningful fashion the timing of the transactions surrounding their grain sales. Of course, the fact that Fleming was incurring losses in the commodities market and paying those losses, contributes to the fact that it is impossible to determine the source of the money in the account.

KSBT is entitled to summary judgment on the issue of conversion.

### Pro tanto

■ The Ad–Rem plaintiffs also contend that they are, irrespective of *Bolan*, entitled to a pro tanto assignment under *Ballard v. Home Nat. Bank,* 91 Kan. 91, 136 P. 935 (1913). They contend that the uncontroverted facts indicate that KSBT agreed or impliedly agreed not to setoff funds that were committed to accounts payable. The plaintiffs contend that the KSBT's tacit agreement coupled with its knowledge of Fleming's operation entitle them to a pro tanto assignment of funds. KSBT rather casually dismisses this argument in a footnote. The court is, however, compelled to agree with KSBT's analysis.

In *Ballard,* the Supreme Court of Kansas held:

"All the authorities are agreed upon the rule of law declared in the above case, that a bank which accepts a deposit of money made by a depositor for a special purpose, under an agreement that it will pay the amount when needed for that purpose, can not rightfully appropriate such deposit to discharge the depositor's indebtedness to it." (Note, 30 L.R.A., n.s., 517; see, also, Notes, 111 Am.St. Rep. 415; 2 Ann.Ca. 206; 19 Ann.Cas. 488.) It is not necessary, in order for this rule to apply, that there shall be what is strictly and technically known as a "special deposit." It is enough that there is an agreement for a particular application of the fund. The bank's right to a lien upon deposits is not of such character that it may not be waived....

"Of the general rule that a bank to whom a depositor is owing a matured indebtedness may appropriate the general deposit of its debtor to the discharge of the obligation, there can be no doubt.... But it is no less certain that a deposit made for a special purpose, *or under a special agreement,* can not rightfully be so appropriated.... Indeed, the proposition that a bank enjoys no exemption from the general rule by which every party to a business transaction or agreement is legally bound to respect the obligation of his contract is one which ought to require neither argument nor citation of authority."

91 Kan. at 94, 136 P. 935.

In short, there is no evidence indicating that such an agreement existed. The written agreements between KSBT and Fleming did not create such an agreement. On the contrary, those agreements gave KSBT the right to setoff or otherwise collect funds in Fleming's account. The court rejects the plaintiffs' contention that KSBT's failure to exercise the right of setoff (at

Fleming's request) prior to July 25, 1984, waived that right and gave rise to an implicit or tacit agreement as to the ownership of funds in the Fleming account.

The court recognizes that the plaintiffs in this case are the unfortunate victims of the financial ruin of Fleming. While the court is not unsympathetic to this series of events which leaves the plaintiffs only partially compensated, the court is compelled to conclude that the plaintiffs have not demonstrated a sufficient property interest to survive summary judgment.

IT IS THEREFORE ORDERED that KSBT's motions for summary judgment in Case Number 89–1314 (Dk. 6), Case Number 89–1315 (Dk. 6) and Case Number 89–1316 (Dk. 19) are granted.

IT IS FURTHER ORDERED that the plaintiffs' motion for cross-summary judgment in Case Number 89–1316 (Dk. 46) is denied.

IT IS FURTHER ORDERED that the trustee's motions for summary judgment in Case Number 89–1314 (Dk. 12), Case Number 89–1315 (Dk. 46) and Case Number 89–1316 (Dk. 22) are dismissed as moot.